412

53 A.3d 361

James Allen KULBICKI

v.

STATE of Maryland.

No. 2940, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Sept. 26, 2012.

Edwin J. Kilpela, Jr., Denver, CO (Wheeler, Trigg, O'Donnell, LLP, Denver, CO, Robert M. Cary, Williams & Connolly, LLP, Washington, D.C., Paul B. DeWolfe, Public Defender, Baltimore, MD) on the brief, for Appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WRIGHT, MATRICCIANI, and WATTS, JJ.

WRIGHT, J.

Following a jury trial in the Circuit Court for Baltimore County, appellant, James Kulbicki, was convicted of first degree murder on October 20, 1993. On December 1, 1994, this Court reversed and remanded for a new trial. *Kulbicki v. State*, 102 Md.App. 376, 649 A.2d 1173 (1994). On November 22, 1995, Kulbicki was again convicted, by a jury, of murder,

as well as a related handgun charge. He was sentenced to life in prison without parole. On December 20, 1996, this Court affirmed Kulbicki's convictions, and on April 9, 1997, the Court of Appeals denied Kulbicki's petition for writ of certiorari. *Kulbicki v. State*, 345 Md. 236, 691 A.2d 1312 (1997).

On or about March 17, 1997, while his request for certiorari review was pending, Kulbicki filed a petition for postconviction relief. After filing several amendments and repeatedly seeking postponements of his postconviction proceedings, Kulbicki filed an amended petition for postconviction relief on April 4, 2006. Following a five-day hearing in April 2007, the circuit court denied postconviction relief through an opinion and order dated January 2, 2008. Kulbicki then filed an application for leave to appeal the denial of postconviction relief, which this Court granted on March 9, 2010.

## Questions Presented

We have rephrased and renumbered the questions presented by Kulbicki, as follows:[1]

1. Where Kulbicki alleged that his conviction was based on unreliable, false, and misleading scientific evidence, did the postconviction court correctly conclude that he did not have a cognizable due process claim?

2. Where Kulbicki alleged that the State used perjured, false, and misleading expert ballistics testimony in se-

---

**1.** Kulbicki presented these two issues for our review:
 1. Whether a defendant who has been convicted on the basis of unreliable scientific evidence has a due process claim cognizable through the Uniform Post Conviction Procedure Act.
 2. Whether the Circuit Court erred by denying Appellant a new trial when the evidence established that 1) the State used unreliable, false, and misleading scientific evidence; 2) the State introduced perjured expert testimony; 3) Appellant's attorneys failed to investigate and challenge the scientific evidence presented by the State; and 4) Appellant's attorneys failed to object when the State told the jury that Kulbicki's consultation with an attorney following his arrest constituted evidence of guilt and his appellate counsel failed to raise the issue on appeal.
 However, in the argument section of his brief and at oral argument, Kulbicki set forth three issues.

curing his conviction, did the postconviction court correctly find that he was not denied a fair trial?

3. Did the postconviction court correctly conclude that Kulbicki failed to establish his ineffective assistance of counsel claim?

For the reasons that follow, we affirm the circuit court's judgment.

### Facts

The testimony at Kulbicki's 1995 trial established that at about 8 a.m. on Sunday, January 10, 1993, Walter Kutcha was walking his dog near the archery range at Gunpowder State Park when he saw a body lying by one of the trash cans. Suspecting "foul play," Kutcha went to a park ranger's cabin and came back with Ranger Ross Harper. Upon their return, Kutcha and Ranger Harper discovered that the body was that of a deceased woman, lying on her back.

Officers of the Baltimore County Police Department responded to the scene at approximately 8:30 a.m. Detective William Ramsey, a member of the Baltimore County Police Department's Homicide and Missing Persons units, testified that he arrived at 10:18 a.m. and began his investigation. He observed blood on the victim's forehead, around her nose, and on the right side of her shoulder. Det. Ramsey also noted that the victim's jewelry had not been removed. Upon turning the body over, Det. Ramsey saw a wound near the back of the victim's head, but no blood on the ground underneath. Based on the leaves and debris under the victim's jacket, the position of her clothes and arms, the disturbance of the leaves and debris in an area leading toward the body, as well as the absence of bullets and shell casings on the surrounding ground, Det. Ramsey concluded that the victim had "been killed somewhere else and taken there and ... dragged there and dumped."

Det. Ramsey unzipped the victim's jacket and saw that she was wearing a Royal Farms store smock with a name tag that said "Gina." While Det. Ramsey was conducting his investiga-

tion, he received a call from the Baltimore City Police Department instructing him to contact the city's Homicide Unit. Upon doing so, Det. Ramsey was informed that the city police were "investigating a missing girl from Baltimore City." Eventually, the Baltimore City Homicide Squad arrived at the crime scene, along with "a subject . . . who identified the victim as Gina Marie Neuslein."

Geraldine Neuslein, Gina's mother, testified that she last saw Gina on Saturday, January 9, 1993, when Gina left to walk to work at around 3:30 p.m. At about 4:10 p.m., Geraldine received a call from Gina's employer, stating that Gina never arrived.

During Det. Ramsey's investigation, he received "information over the radio that there was an individual who might have some information relative to the crime." Det. Ramsey sent an officer to interview that witness, Barbara Clay. At trial, as a witness for the State, Clay testified that at approximately 3 p.m. on January 9, 1993, she and her son went to the archery club at Gunpowder State Park. As they were leaving the parking area around 4:40 p.m., she saw a black Ford pickup truck coming down the road with its headlights on. When the truck turned into the parking area, it passed parallel to Clay's vehicle, about four feet away. With her window down, Clay raised her hand, "yelled and [ ] said hi." The driver of the truck "[s]lowly looked at [her] full face" but did not respond. Clay identified the driver as Kulbicki.

After passing the truck, Clay drove about one third of a mile down the road and parked, hoping to see some deer. After waiting approximately fifteen minutes, Clay left with her son. She did not see the truck leave, nor did she see any other vehicles enter the area.

The next morning, Clay heard information from a television news program that prompted her to call the Baltimore County Police Department.[2] Upon calling the authorities, Clay re-

---

**2.** Although Clay did not provide details about the news program because it was hearsay, it is presumed that she heard information about a body being found at Gunpowder State Park.

layed information that was not provided on the news. Specifically, she told an officer that she "had seen a white male in his mid-thirties driving a Ford longbed pickup truck" at the archery range parking lot at Gunpowder State Park. Clay added that the driver had dark hair and "was wearing a dark jacket with a contrasting lighter shirt."

On the evening of January 13, 1993, Clay saw a television broadcast showing a man in shackles being arrested. Because of the man's "very distinctive profile, [and] very distinctive nose," Clay "without doubt, [ ] knew that was the man that [she] saw at Gunpowder State Park." Thus, Clay called the police and told them that she "recognized that man that they had arrested . . . as being the man that [she] saw."

Shortly after Det. Ramsey concluded his investigation at the park on January 10, 1993, he received information that prompted him to visit the home of James Kulbicki, a sergeant of the Baltimore City Police Department, to ask questions about Gina. Det. Ramsey was accompanied by his partner, Detective Robert Capel. Kulbicki told the detectives that "he did know Gina and has been friends with her for about four years." Without prompting, Kulbicki added that he and Gina were "very good friends, although they've never had a sexual relationship."

Kulbicki stated that he last saw Gina at around 3:30 p.m. on Friday, January 8, 1993, when he picked her up close to her house and drove her to work. Kulbicki also stated that he last spoke to Gina when she called him on "Friday night at midnight into early Saturday morning." When Det. Capel informed Kulbicki that Gina's body was found in Baltimore County, Kulbicki said he suspected that was the case, because the detectives admitted they were from the Homicide Squad. Kulbicki did not ask where and how Gina was killed. According to Det. Capel, Kulbicki "just said he didn't have anything to do with it."

The detectives asked Kulbicki about an upcoming paternity hearing scheduled for the following Wednesday as well as

genetic tests indicating that Kulbicki was the father of Gina's 18–month old child. In response, Kulbicki said:

> Well, that's absolutely impossible that I'm the father. I don't believe in genetic tests. And the only reason why they'd even be closest, because we're both Slavic.... I've never had sex with her.

When the detectives first interviewed Kulbicki, his black Ford pickup truck was parked outside the house. The following day, the police returned with a warrant. They seized, among other things: Kulbicki's pickup truck, which had not been moved since the detectives' prior visit; a denim jacket taken from a hall closet; and a fully loaded .38 Smith & Wesson revolver with a two-inch barrel and its leather holster.

Detective Patrick Kamberger, a Crime Lab mobile technician with the Baltimore County Police Department, processed Kulbicki's truck on January 11, 1993. Det. Kamberger testified that the truck, a 1988 Ford F250, had a "filthy" exterior, but "inside the truck appeared to be clean." The first thing he noticed when he opened the door was "a smell [of] household cleaner." According to Det. Kamberger, there was no surface dust on the dashboard or around the steering wheel, and the floorboard underneath the driver's floor mat was damp, although the mat itself was dry.

Det. Kamberger noticed that a piece of red plastic molding was missing from the rear passenger-side window, revealing a rubber strip that had metallic marks. Beneath the rubber strip, Det. Kamberger noticed "an impact area" or "i[n]dentation." Subsequent chemical testing of the rubber strip established that the rubber was struck by something made of lead. A piece of red plastic fitting the damaged molding area was found in the truck bed.

Inside the cab, there was no blood visible to the naked eye. Preliminary examination of the truck using ultraviolet light, however, indicated the possibility that blood stains were present. Therefore, Det. Kamberger requested the assistance of a serologist from the Maryland State Police Department.

The serologist, Matthew Abbott, was accepted by the circuit court as an expert in the area of forensic serology. He testified that fourteen blood stains were found on seven areas of the truck, including the driver's side door, floor mat, seat belt, bench seat, rear bench seat, rear floor mat, and underneath the rear floor mat. According to Abbott, the stains found on the cloth seat belt, the seat belt's plastic cover and tags, bench seat, underneath the bench seat, and underneath the rear floor mat were human and bore genetic markers consistent with the victim's blood and inconsistent with Kulbicki's. Additional stains on the seat belt, seat belt patch, bench seat, back of the bench seat, rear bench seat, and rear floor mat indicated human blood, but further testing was not possible. Similarly, due to the small samples found on the driver's side door and floor mat, Abbott was able to detect the presence of blood on those areas, but could not conclude anything further.

The denim work jacket seized from Kulbicki's hall closet had what appeared to be blood stains clearly visible on the left sleeve. Det. Capel testified that when Kulbicki had reviewed the list of property being taken, he asked, "The jacket that you're taking, is that my jean work jacket?" Kulbicki did not ask about any of the other items.

Linda Watson, a Forensic Chemist Supervisor in the Biology DNA Unit at the Maryland State Police Crime Laboratory, stated that she extracted DNA from the blood stain found on the jacket. After processing the sample, she concluded that "the DNA type obtained from the blood stain on the jacket matche[d] the DNA profile developed from the blood of Gina Marie Neuslein." According to Watson, the probability of a random match in the Caucasian population was one in seven million.

Assistant Medical Examiner James Locke testified that he had performed an autopsy on the victim at 9 a.m. on January 11, 1993. Locke stated that the victim, a twenty two-year-old white female, died of "a contact gunshot wound to the head," and that the manner of death was homicide. According to

Locke, the abrasions on the victim's body and the condition of her clothing were consistent with having been dragged over the ground. Although the time of Gina's death could not be precisely determined, Locke stated that a time of "four or [five] o'clock in the afternoon, January the 9th of 1993, is [ ] consistent" with his findings.

Locke testified that the fatal bullet traveled diagonally, from front to back and left to right, through Gina's head. The entrance wound had a "keyhole fracture," indicating that "the bullet entered at a very sharp angle and not directly perpendicular to the skull or to the scalp." Therefore, "a portion of the skull entered into the brain and, also, a portion of the skull may have exited from the body." There was also an exit wound from which "a piece of bone ... or a piece of the bullet had exited from the scalp." A fragment of the bullet was recovered from one side of the brain.

Locke added that evidence of burning on the margin of the entrance wound indicated that the barrel of the gun was placed directly against the victim's head. Extensive bleeding and bruising under the scalp on the right side indicated that Gina's head had hit a hard surface. According to Locke, evidence from the autopsy was "consistent with the passenger of the car being shot by a driver."

When police searched Kulbicki's vehicle, they found a small object near the rear passenger seat. Subsequent testing established that its major components were calcium and phosphorus, the major components of bone. The fragment also contained "some lead." While vacuuming the truck, the police found three other bone chips and a smaller bone fragment.

Dr. Douglas Owsley, a curator and division head for the Department of Anthropology at the Smithsonian Institution's National Museum of Natural History, examined the larger bone fragment using a "stereo zoom microscope" and determined that it was part of the outer layer of a human skull. According to Dr. Owsley, fractured edges indicated that "a tremendous amount of traumatic force ... caused the evulsion of this bone fragment." In addition, the presence of embed-

ded lead and carbon deposits was "consistent with a contact gunshot wound." Testing of the smaller bone chips also revealed metallic particles embedded in the bone, as well as soot deposits and evulsion fracturing.

Karen Quandt, a senior molecular biologist who was admitted as an expert in DNA profiling, testified that she performed RFLP[3] DNA testing on the skull fragment and PCR[4] DNA testing on the three bone chips. Four of the seven band patterns revealed by the RFLP testing matched those of Gina. Because other bands could not be visualized due to sample degradation, Quandt testified only that Gina could not be excluded as the source of the bone fragment. PCR testing, which can be performed on smaller or more degraded samples, likewise indicated that Gina could not be excluded as the source of the bone chips. According to Quandt, the frequency of the PCR type found in the bone chips was 1 in 640 among Caucasians.

The State also presented the testimony of Ernest Peele, an agent with the Federal Bureau of Investigation ("FBI") who was admitted as an expert in bullet and lead pellet composition analysis, also known as Comparative Bullet–Lead Analysis ("CBLA").[5] Peele explained that, by performing trace element analysis, CBLA allowed comparison of the bullet

---

3. According to testimony presented by the State at trial, RFLP, or Restriction Fragment Length Polymorphism, "is the DNA test that most of the public is familiar with." RFLP generates:

 bands that you see on a piece of x-ray film.

 * * *

 The basis of RFLP testing is ... looking at different areas of a person's gene, ... or their DNA. When we look at a combination of different sites, [the presence of] more sites ... indicates a strong probability or possibility of that person having deposited a specific biological fluid.

4. PCR, or polymerase chain reaction "takes a small amount of DNA, amplifies it millions of time[s] over to a quantity that [is detectable]."

5. The technique is sometimes referred to as "Compositional Analysis of Bullet Lead." *See United States v. Berry*, 624 F.3d 1031, 1035 (9th Cir.2010); *see also Clemons v. State*, 392 Md. 339, 365, 896 A.2d 1059 (2006).

fragment recovered during the autopsy and the bullet fragment found in Kulbicki's truck, as well as six unfired cartridges seized from Kulbicki's handgun. Peele testified that the bullet fragments from Gina's brain and Kulbicki's truck exhibited "the same amounts of each and every element . . . detected," and were thus "analytically indistinguishable." Peele added that the results were "what you'd expect if you were examining two pieces of the same bullet, they are that close, two pieces of the same source."

After comparing one of the bullets from Kulbicki's handgun, labeled Q–6, to the bullet fragments, labeled Q–1 and Q–2, Peele concluded that the Q–6 bullet was "measurably different," but "unusually close in that that's not what you'd expect, unless there's some association between the two groups," such as "being made by the same manufacturer on or about the same time." Nonetheless, Peele opined that the Q–6 was "close enough that I have seen those differences, . . . but, certainly, they are also different enough that I can't really include [it] as well as I would Q–1 and 2 to each other." Peele further stated that although the composition of the six unfired cartridges, labeled Q–4 through Q–9, differed, "these differences are not very large." According to Peele, the differences "can be expected" as "there are usually a number of different compositions in one box."

On cross-examination, defense counsel concentrated on differentiating the unfired cartridges from the bullet fragments. The following transpired:

Q: [W]hen compared to Q–6, which was a bullet which was provided to you or a cartridge for your examination for comparison with Q–1 and Q–2, that, you've testified, is measurably different, correct?

A: Yes, sir. The amounts of arsenic and copper are slightly different.

Q: Well, slightly different, is that something else [than] measurably different?

A: No, sir. The same.

\* \* \*

Q: However, you cannot state that samples Q–4, 5, 6, 7, 8, and 9 are consistent with Q–1 and Q–2 as having come from the same box, correct?

A: Q–6 is much more so than any of the rest. Q–6 is so close that, certainly, that could have been in the same box.

Q: It, it could have been?

A: Certainly.

Q: But you're not sure of that, correct?

A: No, sir, I'm not sure of that.

Joseph Kopera, an examiner with the Maryland State Police Firearms Unit, was presented as an expert in the field of firearms identification. Before he was admitted as an expert, he was asked a few qualifying questions, including the following:

Q: Okay. Were you a graduate of this profession as a result of formal school?

A: There are no colleges or universities here in the United States at all that offer a degree in the field of firearms identification for ballistics. All expertise is obtained through on-the-job training. I served an apprenticeship for five years with the Baltimore City Police Department and the FBI in obtaining this expertise.

My educational background, my personal educational background is I hold a degree in engineering from Rochester Institute of Technology and, also, engineering degree from the University of Maryland here in the State of Maryland. I am on the Board of Directors for the Association of Firearm and Toolmark Examiners, which is the certifying society of firearm examiners here in the United States. I'm also on the staff at several local colleges, did teaching in the area of forensic science and criminal justice.

Q: And how many firearms-related cases do you examine per year, on the average?

A: On the average for a 20–year period, I would examine anywhere between 1,000 to [1,200] cases, of which I would testify in court between 100 to 125 times per year.

Q: Have you had an occasion in the past to qualify as an expert in firearms identification?

A: Yes, I have qualified in the [s]tate of Maryland, states of Virginia, Pennsylvania, Delaware and the Federal courts here in the United States.

After being accepted by the court as an expert, Kopera testified that the bullet fragment found in Kulbicki's truck had cannelures, or markings, consistent with "a large caliber" such as .38 or larger. Kopera also stated that damage to the rubber stripping inside Kulbicki's truck was caused by a bullet fragment. According to Kopera, the bullet only ripped the area, and did not create a hole, because it "was slowed down by hitting something else prior to hitting the rubber piece." On cross-examination, Kopera testified that Kulbicki's handgun "had been examined and found to be in the cleaned condition."

The defense presented evidence that Kulbicki was running errands in his truck on the afternoon of January 9, 1993. Numerous witnesses testified to seeing Kulbicki at their respective businesses sometime between 3 and 4 p.m. that day. All of those witnesses knew, had previously worked with, or were familiar with Kulbicki. In addition, Kulbicki's wife testified that Kulbicki was with her from 4:30 p.m. until he left for work at about 10:45 p.m.

Kulbicki, who took the stand on his own behalf, denied killing Gina.

During closing arguments, the prosecutor went over all of the evidence, "fill[ing] in the gaps" of the case with "forensic science." The State's argument, which spanned thirty-three pages of transcript, included the following two paragraphs regarding Peele's and Kopera's testimony:

From that bullet fragment, you heard from ... Mr. Kopera, who examined it and who ... told you about the cannelures ... that he saw on the bullet fragment retrieved

from Gina's head which told him both of these fragments came from a .38 caliber bullet.

And then from ... Mr. Peele, the FBI Agent, we learn that compositionally when it is broken down to parts per million into that minute detail those two bullet fragments, the one from Gina's head, the one in the Defendant's truck, are the same, are the same. You can't tell one from the other.

After deliberating, the jury convicted Kulbicki of first degree murder.

In 2006, Kulbicki filed an amended petition for postconviction relief. The circuit court conducted a hearing on the petition from April 19 through 25, 2007. Kulbicki argued:

He did not receive a fair trial because the State used inaccurate, misleading and unreliable scientific evidence. He did not receive a fair trial because the State failed to disclose exculpatory evidence in violation of its Brady [6] obligations. He did not receive a fair trial because his defense attorneys failed to properly perform their duties as required by the Sixth Amendment [7] of the [C]onstitution.

In particular, Kulbicki challenged "four pillars" of the State's case: (1) FBI Agent Peele's conclusions based on CBLA; (2) Kopera's testimony; (3) Clay's testimony; and (4) testimony regarding DNA and serology as to bone fragments and blood found in Kulbicki's truck.

First, Kulbicki stated that Peele "testified extensively" about CBLA, which had since been "exposed as nothing more

---

6. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. The Sixth Amendment to the United States Constitution states:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining

than a series of speculative and exaggerated claims." Relying on *Clemons v. State*, 392 Md. 339, 372, 896 A.2d 1059 (2006), a case in which the Court of Appeals held that the conclusory aspects of CBLA are not admissible under the *Frye–Reed* test,[8] Kulbicki argued that "the introduction of improper ballistics and firearms evidence in this case is sufficient to warrant reversal of conviction." Second, Kulbicki averred that Kopera committed perjury at the trial "when he testified that he had attended the University of Maryland and the Rochester Institute of Technology," and when he "falsified documents in order to conceal and protect his lies." Moreover, Kulbicki alleged that Kopera's testimony "was inconsistent with his own reports and bench notes." Third, Kulbicki argued that "Clay's identification should have been suppressed because it was unreliable and it was based on improperly suggestive procedures." Fourth, Kulbicki challenged the validity of the DNA and serology testing that was performed. In addition to those four main contentions, Kulbicki argued that trial counsel's failure to preserve issues for appeal constituted ineffective assistance of counsel.

At the postconviction hearing, Kulbicki presented the testimony and affidavits of experts in the fields of metallurgy, chemistry, firearms and ballistics, visual science, and molecular biology. William Tobin, a former metallurgist for the FBI, testified that Peele had no scientific basis for his testimony linking bullet fragments to one another on the basis of their elemental composition. According to Tobin, Peele's testimony that the bullet fragments recovered from the autopsy and Kulbicki's truck were "analytically indistinguishable" was "not an accurate statement." Instead, Tobin opined that the bullet

---

witnesses in his favor, and to have the Assistance of Counsel for his defence.

**8.** *"Frye–Reed* is the test in Maryland for determining whether expert testimony is admissible. The name is derived from two cases, *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), where this standard of general acceptance in the relevant scientific community was first articulated, and *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), where we adopted the *Frye* standard." *Blackwell v. Wyeth*, 408 Md. 575, 578 n. 1, 971 A.2d 235 (2009).

fragments' arsenic contents differed, and therefore should have been "declared analytically distinguishable or dissimilar."

Kulbicki next presented evidence, and the State stipulated, that Kopera had lied about his credentials at the trial.[9] The evidence demonstrated that Kopera did not earn degrees in engineering, as he alleged, and had never been accepted to the University of Maryland or Rochester Institute of Technology. Rather, the University of Maryland transcript in Kopera's personnel file was a forgery.

To further discredit Kopera's testimony, Kulbicki presented the testimony of John Nixon, who was accepted as an expert in firearms and ballistics. Nixon testified that, contrary to Kopera's opinion, "you wouldn't be able to say" what caused the damage to the rubber stripping on Kulbicki's truck window. In addition, Nixon noted that Kulbicki's handgun had a right-hand twist while the bullet fragment recovered during the autopsy had a left-hand twist. Moreover, using Kopera's measurements of the markings on the bullet fragment and Kulbicki's weapon, Nixon concluded that Kulbicki's handgun "did not fire that bullet." Citing the FBI ballistics database, Nixon testified that the bullet fragment was most likely fired from a .32 caliber weapon. Nixon added that, using Kopera's measurements, the database did not contain a single match for a .38 caliber Smith & Wesson.

While Nixon was on the stand, Kulbicki introduced Kopera's bench notes into evidence. Contrary to Kopera's testimony that the bullet fragments from the autopsy and Kulbicki's truck came from a "large caliber" gun, Kopera's bench notes stated that the caliber for the former was "medium" and that the latter "couldn't be determined." In addition, while Kopera testified that his caliber determination was based on the cannelures, his laboratory report stated that the cannelure marks had "no value for comparison purposes." Kopera's testimony that Kulbicki's handgun had been "in the cleaned

---

9. Kopera could not be examined with regard to these issues, as he had committed suicide prior to the postconviction hearing.

condition" was also contradicted by his notes, which stated that the gun was "dirty" with "residue" in the barrel and cylinder.

Dr. Christopher Palenik, who was admitted as an expert in microscopy and chemistry, testified that Kopera improperly conducted the test that led to his conclusion that damage to Kulbicki's window was caused by a bullet fragment. Dr. Palenik explained that, by failing to apply hydrochloric acid, Kopera did not properly complete the test for the presence of lead. Kopera's claim that he did not use hydrochloric acid because the Maryland State Police protocols did not require its use in 1993 was contradicted by the text of the protocols.

Dr. Elizabeth Johnson, who was admitted as an expert in molecular biology and forensic DNA profiling, testified that the methodology used by the State's laboratory made it impossible to conclude that the DNA samples that were tested had been retrieved from Gina's body or from the bone fragments in the truck. Dr. Johnson opined that the bone fragments were improperly stored and handled, and the State's technicians failed to properly clean them prior to testing. As a result, Dr. Johnson believed that the State should have deemed the results "inconclusive."

During the postconviction hearing, Kulbicki called both of his trial counsel to testify, but neither could recall specific events from the trial or their preparation, and the case file no longer existed. Patricia Hall, the lead defense counsel in Kulbicki's 1995 trial, testified that she had originally sat in a second chair capacity as defense counsel in Kulbicki's 1993 trial. John Franke, a 1988 law school graduate, assisted Hall in the 1995 trial. Franke stated that he had previously handled other criminal jury trials, but none of them involved the charge of murder in the first degree. Franke testified that at the time of the trial, he was not "familiar with the practice of expert witnesses [preparing] bench notes in addition to their official report produced at trial."

The State presented testimony from one witness, Michael Thomas, a firearms identification examiner with the Baltimore

County Police Department, who was accepted by the circuit court as an expert in firearms identification. Thomas "couldn't conclude an awful lot" from the bullet fragment recovered from the autopsy because it was "very mutilated and deformed." He was, however, able to say that "it didn't come from a small caliber firearm." In addition, Thomas could not rule out a .38 or .32 caliber weapon. With regard to the window stripping from Kulbicki's truck, Thomas testified that he tested the rubber-like strip using hydrochloric acid, and found that it tested positive for the presence of lead. On cross-examination, Thomas acknowledged that the FBI database did not list a .38 Smith & Wesson revolver as being capable of firing the bullet recovered during the autopsy. Thomas based this conclusion on a comparison of his own measurements to the database. Thomas also testified that the bullet "might have a slight left twist."

By opinion and order dated January 2, 2008, the circuit court denied Kulbicki's petition for postconviction relief. With regard to the issues raised on appeal, the court ruled as follows:

The Uniform Post-[C]onviction Procedure Act applies only to limited categories of error. Not all discoveries or developments after conviction that shed new light on the trial provide a basis for relief. Most significantly, the question of guilt or innocence is beyond the purview of post-conviction relief, as the proceedings do not serve as a substitute for appeal or a motion for a new trial.

Of equal importance, claims of newly discovered evidence also provide no basis for post-conviction relief. . . .

Thus, in addressing the Petitioner's claims, this Court is limited to allegations of constitutional violations, ineffective assistance of counsel, and other matters clearly governed by the Uniform Post–Conviction Relief statute. Arguments of guilt or innocence, and concerns regarding newly discovered evidence and changes in science and technology within the intervening years are simply not a proper avenue for relief.

\* \* \*

Plainly, Mr. Kopera committed perjury at trial. He testified to a degree and to credentials that were patently false....

It is equally clear that this perjury was unknown to the prosecution at the time of trial....

Under the current case law in Maryland, perjury that was not known to the prosecution at the time does not provide a basis for post-conviction relief. However, this Court believes that the Maryland appellate courts would likely follow the line of cases that find that knowledge of the falsity of a statement by a state law enforcement witness is, in effect, imputed to the State. Nevertheless, there must then be a showing [of] materiality of the falsity in order to warrant relief.

In analyzing the question of materiality, the issue is the likelihood that the truth would have produced a different outcome, not that knowledge that the witness was committing perjury would have impacted the outcome. This distinction is critical. Mr. Kopera's academic credentials were essentially meaningless. He was not conducting testing that required an academic degree. His professional training and experience qualified him as an expert, regardless of his academic pedigree.... There simply is no likelihood that the jury's determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed.

\* \* \*

Petitioner's primary focus in this claim is the introduction of evidence of [CBLA] at trial. However the challenge to this evidence does not fit into any recognized category for post-conviction relief.

\* \* \*

CBLA ... has actually not been adequately tested to demonstrate that conclusions drawn regarding the relatedness of batches of metal can support conclusions that specific fragments came from the same bullet or batches of bullets. The Court of Appeals reached essentially this conclusion in

*Clemons, supra.* However the studies that shed light on these conclusions were not available at the time this case was tried. At the time of both the original trial [and] the re-trial, it was generally accepted in the relevant scientific community that CBLA was valid and reliable science.

There is nothing to suggest that the State presented expert testimony that it knew was not sound. Nor is there any evidence to suggest that defense counsel was ineffective at the time of trial by failing to anticipate this scientific development. . . .

There simply is no basis under the post-conviction laws that accords relief under these circumstances. Generally, such claims are handled . . . through a Motion for a New Trial based upon newly discovered evidence . . . Clearly the bullet analysis was central to the theory of the prosecution . . . However this is not before the Court on a motion for new trial.

\*　　\*　　\*

Petitioner's primary claim for ineffective assistance is based upon his argument that trial counsel essentially ceded the field of scientific evidence to the State. . . .

[I]t is important to note that Ms. Hall was an experienced criminal defense attorney who served as second chair at the Petitioner's original trial, and then was lead counsel at the re-trial. Mr. Franke also was an experienced criminal defense attorney.

\*　　\*　　\*

With CBLA, ineffective assistance is not a legitimate argument. The questions concerning the reliability of that science didn't even surface until long after Mr. Kulbicki's trial. . . .

In looking at the balance of the scientific evidence, counsel was faced with a difficult strategic decision concerning the blood and bone analysis. While evidence at this post-conviction hearing demonstrates that one could have conducted more extensive cross-examination, particularly in the DNA arena, there still is strong evidence that could be

linked to the victim ... Defense counsel was faced with a strategic decision whether to challenge multiple independent links to Ms. Neuslein, or to challenge agency. Clearly counsel opted for the latter strategy. The defense essentially acknowledged in opening that the shooting occurred in Mr. Kulbicki's truck. The focus of their strategy was evidence of alibi, time of death, and that the truck and other items from the Kulbicki home were not in his exclusive control, suggesting others with access to those items had motive.

These were strategic decisions. They were based upon the multiple areas of science that would likely establish a link between the truck and the death. These were reasoned decisions made by experienced counsel who had already seen this evidence play out once before at trial. While you might generate some question concerning a specific scientific link, the collective weight of all of those links would nevertheless be compelling. Counsel's approach was not ineffective.

(Footnotes and internal citations omitted).

## Discussion

Kulbicki's argument is threefold. First, he alleges that the use of unreliable evidence, such as CBLA, is a violation of due process cognizable under the Uniform Postconviction Procedure Act ("UPPA"). Second, Kulbicki avers that the State's use of "perjured, false, and misleading expert ballistics testimony" denied him his constitutional right to a fair trial. Third, Kulbicki argues that his trial counsel provided ineffective assistance.

In response, the State contends that Kulbicki's claim regarding the admission of CBLA evidence at his trial "[is] not cognizable" under UPPA and, "in any event, [is] unfounded." Next, the State argues that Kulbicki's perjury claim does not afford him a ground for postconviction relief, particularly because the prosecutor was unaware of the perjury. Finally, the State argues that Kulbicki "failed to meet his burden of

establishing his claim that his trial counsel rendered ineffective assistance."

■■■■■ On appellate review of a decision by a postconviction court, we will not disturb the court's factual findings unless they are clearly erroneous. *Lopez v. State,* 205 Md.App. 141, 154, 43 A.3d 1125, 1132 (2012) (citing *Arrington v. State,* 411 Md. 524, 551, 983 A.2d 1071 (2009)). Although we review the court's factual determinations under the clearly erroneous standard, "we make an independent determination of relevant law and its application to the facts." *Arrington,* 411 Md. at 551, 983 A.2d 1071 (citation omitted). Based upon the relevant case law, we uphold the circuit court's ruling.

## I. CBLA Evidence

The Uniform Postconviction Procedure Act "applies to a person convicted in any court in the State who is . . . confined under sentence of . . . imprisonment." Md.Code (2001, 2008 Repl.Vol.), § 7–101 of the Criminal Procedure Act ("CP"). A convicted person may begin a proceeding under this title if he or she claims:

> (1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;
>
> (2) the court lacked jurisdiction to impose the sentence;
>
> (3) the sentence exceeds the maximum allowed by law; or
>
> (4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy.

CP § 7–102(a). In addition, CP § 7–102(b) requires that "the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction." "For each trial or sentence, a person may file only one petition for relief" under UPPA, and in cases where a sentence of death has not been imposed, an UPPA petition "may not be filed more than 10 years after the sentence was imposed." CP § 7–103.

 In this case, it is undisputed that Kulbicki's CBLA argument satisfied the requirements of CP §§ 7–101, 7–102(b), and 7–103. He was convicted in the Circuit Court for Baltimore County, was sentenced to life in prison, and has filed one postconviction petition within 10 years after the sentence was imposed. Although Kulbicki's challenge regarding Kopera's perjury was waived,[10] the remainder of the alleged errors raised by Kulbicki in his petition have not been previously litigated or waived in the proceeding resulting in his conviction or in any other proceeding. Therefore, the question presently before this Court is whether "the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State," pursuant to CP § 7–102(a). Kulbicki argues that his conviction, which was based on inaccurate scientific evidence, namely CBLA, violated his due process rights.[11]

 The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "[A] part of the due process guarantee is that an individual not suffer punitive action as a result of an inaccurate scientific procedure." *Armstead v. State*, 342 Md. 38, 84, 673 A.2d 221 (1996) (citation omitted). Although scientific test results "need not be infallible" to meet this standard, the evidence must not be "so extremely unfair that its admission violates fundamental conceptions of justice." *Id.* (citing *Dowling v. United States*, 493 U.S. 342, 352–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). "The Supreme Court has

---

10. We shall further address this issue in Section II of our Discussion, below.

11. In his reply brief, Kulbicki makes clear that his challenge to the State's use of CBLA evidence is "premised on the assertion that the introduction and reliance on that evidence rendered his trial so fundamentally unfair that it violated his right to due process." He rejects the State's contention that he seeks relief based upon newly discovered evidence. *See Douglas v. State,* 423 Md. 156, 175, 31 A.3d 250 (2011) ("claims of newly discovered evidence made pursuant to that statute are not cognizable under the UPPA").

construed this test narrowly, as have the Maryland courts." *Id.* at 85, 673 A.2d 221 (citations omitted). According to the Court of Appeals, "the essence of the due process 'fundamental fairness' inquiry is whether there was a balanced, fully explored presentation of the evidence," which is dependent on "the jury's ability to weigh the evidence, and the defendant's opportunity to challenge the evidence." *Id.* at 87, 673 A.2d 221 (citing *Dowling*, 493 U.S. at 353, 110 S.Ct. 668). Stated differently, "[t]he Constitution ... protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, —— U.S. ——, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012).

In *Clemons, supra,* 392 Md. at 371, 896 A.2d 1059, the Court of Appeals recognized that "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA." Therefore, it concluded that "CBLA does not satisfy the requirement under the *Frye–Reed* test for the admissibility of scientific expert testimony." *Id.* at 372, 896 A.2d 1059. The *Clemons* Court, however, did not determine whether admission of CBLA evidence in cases prior to 2006 constituted a violation of *due process.*[12] *Clemons* addressed an *evidentiary* issue and, thus, applied only *prospectively* to cases to be heard at the trial level. By contrast, the

---

12. It is worth noting that, because the Court's conclusion in *Clemons* was evidentiary and not constitutional, Kulbicki would not be entitled to a new trial for the retrospective application of the *Clemons* ruling, *see State v. Greco,* 199 Md.App. 646, 660, 24 A.3d 135 (2011), *aff'd,* 427 Md. 477, 48 A.3d 816 (2012), even if his petition for post conviction was filed pursuant to CP § 7–106(c), which states:

(1) This subsection applies after a decision on the merits of an allegation of error or after a proceeding in which an allegation of error may have been waived.

(2) Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:

issue before us is whether we can *retroactively* rule that the use of CBLA evidence violated a defendant's *constitutional* right where the defendant was convicted on the basis of such "unreliable" scientific evidence. Because this issue has not been addressed by a court of this state, we look to other jurisdictions for guidance, and we adopt the holding of *United States v. Berry*, 624 F.3d 1031, 1039–43 (9th Cir.2010).

Before turning to the holding in *Berry*, we must briefly explain the state of CBLA evidence. The FBI commissioned the National Research Council ("NRC") to evaluate its use of CBLA and, following the Council's 2004 report,[13] discontinued its use of CBLA at trials. *Id.* at 1037. The NRC report demonstrates that the problem with CBLA is not that the *method* used to *compare* the contents of two bullets is unreliable in some abstract sense,[14] but that it is unreliable to conclude that a CBLA "match" supports *further specific factual assertions put forth at trial.* Most often, these assertions are that matching bullets came from the same box, the same manufacturer, were related in time or geography, or generally linked the defendant to the crime in some unspecified manner. Crucially, these conclusions rested on assumptions unsupported by scientific and statistical testing of the general bullet *manufacturing* process. *See* Nat'l Res. Council at 112–13. First, the NRC found that a CBLA match supports the inference that two bullets came from the same "source" when

---

 (i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and
 (ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

13. The NRC's report is available for public download at the following url: http://www.nap.edu/catalog.php?record_id=10924

14. CBLA evidence is, "in many cases, ... a reasonably accurate way of determining whether two bullets could have come from the same compositionally indistinguishable volume of lead. It may thus in appropriate cases provide additional evidence that ties a suspect to a crime, or in some cases evidence that tends to exonerate a suspect." Nat'l Res. Council, *supra,* at 109, 112.

taken to mean a compositionally indistinguishable volume of lead ("CIVL"). But there was no generally reliable evidence that a CBLA match corresponded to a match among any other type of "source," such as a specific manufacturer, box, time, location, etc. *See id.* at 106–07. Thus, it remained in many cases a distinct possibility that while bullets from the same "source" match each other, they also match bullets from any number of "sources." Second, there was no general knowledge of the probability that manufacturing variations would result in two different lead sources randomly producing matching bullets, producing what is known as a "false positive." *Id.* at 107 ("Although it has been demonstrated that there are a large number of different [CIVL's], there is evidence that bullets from different CIVL[']s can sometimes coincidentally be analytically indistinguishable.").

In *Berry,* the defendant was accused of perpetrating a series of robberies and terroristic attacks that employed, among other weapons, pipe bombs filled with "buckshot," which are lead pellets traditionally used in shotgun shells. 624 F.3d at 1033–34. When Berry and his accomplices were apprehended, federal agents found in their vehicle a number of firearms, grenades, and ammunition, as well as incriminating letters. *Id.* at 1034–35. Agents later discovered more incriminating evidence at the suspects' residences, including fuses of the kind used in the attacks, propane canisters identical to one found in a failed incendiary device at one of the crime scenes, anti–government propaganda, and miscellaneous clothes and weapons matching eyewitness and video evidence of the attacks. *Id.* at 1035.

The suspects were indicted and tried together in 1997, and the government used CBLA tests to compare buckshot used in one of the pipe bombs with buckshot found in Berry's auto shop. *Id.* at 1035–36. The *Berry* Court described the CBLA evidence, as follows:

> Kathleen Lundy, a forensic examiner formerly with the FBI, testified that the buckshot pellets found at the two locations were chemically "indistinguishable," suggesting that both sets of buckshot came from the same source.

Additional evidence greatly strengthened the connection between Berry's buckshot and the buckshot recovered from the pipe bomb. To begin with, the label on the bag of buckshot found in Berry's shop indicated that it came from Hornaday Manufacturing Company. In her research, Lundy learned that Hornaday purchases its lead from a single supplier. Until 1996, that supplier had been Asarco. In early 1996, however, Hornaday had started purchasing lead exclusively from Doe Run. Because the chemical composition of the buckshot used in the Planned Parenthood bomb did not match the composition of either Asarco or Doe Run lead, Lundy believed that the buckshot had been created in 1996, during a time when Hornaday was using lead from both suppliers in its products.

Gregory Hanson, Director of Sales for Hornaday, confirmed much of Lundy's analysis. He testified that Hornaday had created a batch of 436 bags of buckshot from a mixture of Asarco and Doe Run lead in early 1996. In addition, Hanson testified that Hornaday was the only buckshot manufacturer who used bullets that were 3 percent antimony, a metal used to harden lead. Both the pipe-bomb buckshot and the buckshot in Berry's auto shop were 3 percent antimony, strongly suggesting that both came from the batch of buckshot that Hornaday manufactured in 1996. Of this batch, only thirty-two bags were shipped to the area of Spokane, Washington, and Coeur d'Alene, Idaho.

The end result of the CABL evidence was compelling. Between Lundy's and Hanson's testimony, the government narrowed the likely source of the buckshot in the Planned Parenthood pipe bomb to thirty-two bags, two of which were in Berry's possession.

*Id.* at 1035–36.

On appeal from postconviction proceedings,[15] Berry argued that the CBLA evidence used at his trial was so arbitrary as

---

**15.** Berry sought review under 28 U.S.C. § 2255, which provides a remedy in the sentencing court exactly commensurate with that which

to render his trial fundamentally unfair. *Id.* at 1040. The *Berry* Court explained that due process is violated only when the evidence is so arbitrary that the factfinder and the adversary system were not competent to uncover, recognize, and take due account of its shortcomings. *Id.* (citing *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).[16] After reviewing the criticisms of CBLA explained above, the Ninth Circuit held:

> While the [CBLA] evidence introduced against Berry may have been flawed, we do not find it so arbitrary as to render Berry's trial "fundamentally unfair." The criticisms of [CBLA] evidence that Berry relies on indicate that it is precisely the kind of evidence that the adversary system is designed to test. Vigorous cross-examination would have exposed its flaws to the jury.[17]

*Id.*

We see no reason to depart from the holding in *Berry*, and it applies squarely to the present case.[18] The criticisms that

---

had previously been available by habeas corpus in the court of the district where the prisoner was confined. *Berry*, 624 F.3d at 1038.

**16.** As the *Berry* Court noted, *Barefoot* was superseded on other grounds by 28 U.S.C. § 2253(c)(2).

**17.** The *Berry* Court held, in the alternative, that "even if [CBLA] evidence were generally unreliable, we would still be inclined to reject Berry's due process challenge based upon the reliability of the specific testimony in his case." 624 F.3d at 1041. In particular, the *Berry* Court held that "Lundy's testimony was not susceptible to any of the criticisms identified in the National Research Council report" because she "did not testify that the [CBLA] tests definitively linked Berry to the Planned Parenthood pipe bomb," and because her "determination that the pipe bomb buckshot was 3 percent antimony—a feature unique to Hornaday buckshot—linked Berry to the pipe bomb regardless of the [CBLA] tests." *Id.* at 1041–42.

We note, however, that the Ninth Circuit appears to have overlooked the possibility that the match was a "false positive."

**18.** There is no reason to doubt Peele's conclusions that the bullet fragments (Q–1 and Q–2) match each other, and that the bullets recovered from Kulbicki's possession (Q4 to Q–9) match each other. And Peele was sufficiently doubtful of his conclusion that the fragments Q–1 and Q–2 came from the same box as bullet Q–6, which was in

Kulbicki now levels against the CBLA evidence in his trial are the same as those in *Berry*. And as in *Berry*, discrediting the CBLA evidence in this case did not require *positive scientific proof* of assertions contrary to those presented at trial. The flawed assumptions in Kulbicki's case rested on *nothing*; Peele's testimony would have been fully discredited had those assumptions been recognized and their foundations tested. As in *Berry*, Kulbicki's criticisms of CBLA analysis "concern the proper weight of the evidence, not its admissibility. It can hardly be said, therefore, that the adversary system was not 'competent to uncover, recognize, and take due account of its shortcomings.'" *Id.* at 1042 (quoting *Barefoot*, 463 U.S. at 899, 103 S.Ct. 3383). Accordingly, we reject Kulbicki's due process claim.

## II. Perjury and Alleged False Testimony

■ Next, Kulbicki argues that the State's use of Kopera's perjured testimony as well as Kopera's and Peele's "false and misleading" expert ballistics testimonies violated his right to a fair trial. Relying on *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), Kulbicki contends that "the State is charged with the knowing use of perjured testimony when any state agent testifies falsely even if the falsity is unknown to the prosecutor at the time of the testimony in question." In addition, Kulbicki avers that Kopera's conclusions—like Peele's—were "inaccurate, without scientific foundation, and inconsistent with his own reports and notes." Believing that both experts' testimonies were material to his conviction, Kulbicki urges us to reverse.

---

Kulbicki's possession. *See Berry*, 624 F.3d at 1041 ("Lundy did not testify that the [CBLA] tests definitively linked Berry to the Planned Parenthood pipe bomb."); *Commonwealth v. Kretchmar*, 971 A.2d 1249, 1257 (Pa.Super.Ct.2009) (no violation of due process where CBLA expert conveyed the possibility of a random match and expressed "a probability far less than certainty" that the bullets came from the same box). Peele was unequivocal, however, in his testimony that fragments Q-1 and Q-2 and bullet Q-6 were "made by the same manufacturer on or about the same time."

In response, the State argues that in Maryland, "[a]n 'allegation that perjured testimony was offered at trial, absent a showing that the State knowingly used perjured testimony, is not a ground for postconviction relief.'" (Quoting *Gray v. State*, 388 Md. 366, 385, 879 A.2d 1064 (2005)) (internal quotation marks omitted). Alternatively, the State contends that, although Kopera committed perjury, Kulbicki was not denied a fair trial because Kopera's testimony was not material. Lastly, the State asserts that reversal is not warranted because at the time of Kulbicki's 1995 trial, "there was no indication that [Peele] questioned the validity of the matters he asserted or that his testimony was inaccurate or misleading."

At the outset, we note that Kulbicki waived any claims regarding Kopera's perjury. To the extent that comparing or examining Kopera's bench notes would have revealed variances with his trial testimony, and a background investigation would have revealed that Kopera lacked the claimed college degrees, Kulbicki could have raised his contentions on direct appeal. Thus, the postconviction court was not required to address this issue.

■ Even if not waived, Kulbicki's argument still fails. Although we agree with Kulbicki that "the State is charged with the knowing use of perjured testimony when [a police officer] testifies falsely even if the falsity is unknown to the prosecutor at the time of the testimony," we decline to grant the relief he seeks. We explain.

■ It is well-established that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." *Miller v. Pate*, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (citing *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)). Indeed, "a conviction obtained through use of false evidence, known to be such by *representatives of the State*, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (emphasis added) (citations omitted). Citing *Gray, supra*, 388 Md. at 385, 879 A.2d 1064, the State would have us

narrowly interpret the term "representatives of the State," to include only prosecutors and not law enforcement officers or experts. However, a review of the long line of cases regarding this topic leads us to conclude otherwise but does not help Kulbicki as to the bottom line.

When the *Napue* Court announced the rule at issue, it cited, among others, *Curran v. Delaware*, 259 F.2d 707 (3rd Cir.1958), where the United States Court of Appeals for the Third Circuit upheld the lower court's grant of habeas corpus relief. In *Curran*, the Court held that "the knowingly false testimony of [a detective assigned to the case] was sufficient to cause the defendants' trial to pass the line of tolerable imperfection and fall into the field of fundamental unfairness," despite the fact that "the prosecuting officer was in no way a party to or cognizant of the perjured testimony given by certain witnesses ... or of the fact that the law enforcement officers had taken steps to procure false testimony favorable to the prosecution." *Id.* at 713. As Kulbicki points out, the United States Court of Appeals for the Fifth Circuit reached the same conclusion in *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir.1977), where it made clear that, "[i]f the state through its law enforcement agents suborns perjury for use at the trial, a constitutional due process claim would not be defeated merely because the prosecuting attorney was not personally aware of this prosecutorial activity." (Citations omitted). *See also In re Investigation of the W. Va. State Police Crime Lab., Serology Div.*, 190 W.Va. 321, 438 S.E.2d 501, 505 (1993) ("[I]t matters not whether a prosecutor using [a State serologist] as his expert ever knew that [the expert] was falsifying the State's evidence. The State must bear the responsibility for the false evidence."). *Cf. Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

The authority cited by the State does not support its claim that knowledge by the prosecutor, rather than other

state actors, is a necessary requirement for a due process claim based on false testimony. In *Gray*, the Court of Appeals denied postconviction relief after finding "no indication that ... the State knowingly used false testimony at trial." 388 Md. at 384–85, 879 A.2d 1064. In that case, however, it was a fact witness, Erika McCray, who recanted her testimony and not a state agent. *Id.* at 372–73, 879 A.2d 1064. More importantly, the *Gray* Court indicated that relief would have been warranted had "the *officer* who obtained McCray's testimony believed it to be false." *Id.* at 384–85, 879 A.2d 1064 (emphasis added). *See also Height v. Dir., Patuxent Inst.*, 209 Md. 647, 650, 120 A.2d 911 (1956) (indicating that perjury by an "arresting officer," if supported by facts, "would amount to the denial of due process"). Therefore, we expressly extend the federal courts' rulings in *Curran* and *Schneider* to cases in Maryland.

In this case, it is undisputed that Kopera, an examiner with the Maryland State Police Firearms Unit, lied about his credentials at Kulbicki's trial. Because Kopera was a state official, Kulbicki has a valid constitutional claim recognizable under UPPA. Nonetheless, we agree with the postconviction court that Kulbicki's claim fails on the merits because "there must then be a showing [of] materiality of the falsity in order to warrant relief."

In *Stevenson v. State*, 299 Md. 297, 305, 473 A.2d 450 (1984), the Court of Appeals made clear that "the proper rule, which is clearly supportable, requires that an initial inquiry be made to determine if the testimony is material to the outcome of the case; if it is not, the due process clause does not automatically require a new trial." [19] In that case, Stevenson "was charged with the first degree murder of her husband and related

---

**19.** In reaching its ruling, the *Stevenson* Court reviewed some of the Supreme Court cases upon which Kulbicki relies, including *Napue, supra; Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Stevenson*, 299 Md. at 305–07, 473 A.2d 450 ("the knowing and intentional use of false testimony by the prosecution is a violation of

offenses including setting fire while perpetrating a crime."
*Id.* at 299, 473 A.2d 450 (footnote omitted). Dennis Michael-
son, one of the rebuttal witnesses called by the state to
counter defense expert testimony as to the origin of the fire,
"testified that he had graduated cum laude from the Illinois
School of Technology, a fact which subsequently proved to be
untrue." *Id.* at 300, 473 A.2d 450. On appeal, the Court
affirmed the denial of Stevenson's motion for a new trial,
concluding that Michaelson's false testimony "was not material
to the outcome of the case." *Id.* at 308, 473 A.2d 450.

 Here, Kulbicki proved that Kopera presented false
testimony as to his credentials. We agree with the postconvic-
tion court that "there simply is no likelihood that the jury's
determination would have been influenced by the fact that Mr.
Kopera did not have the academic credentials he claimed." As
the State notes in its brief, the record reflected that "ballistics
is a field for which no college degree is offered, and the
expertise for the field is usually based on experience, which
Kopera had in copious amounts." [20]

In his reply brief, Kulbicki cites cases from other jurisdic-
tions in which "courts found that an expert's perjury regard-
ing his credentials constitutes sufficient grounds upon which to
reverse a conviction." Those cases, however, are distinguish-
able. *See United States v. Jones,* 84 F.Supp.2d 124 (D.D.C.
1999) (expert's false qualifications, to which defense counsel
stipulated in defendant's second trial, was deemed material
where the first trial ended in a hung jury and the only
difference in the second trial was the expert testimony); *State*

---

due process providing such testimony is material to the result of the
case."). The Court also cited several cases from Federal Courts of
Appeals, *id.* at 307, 473 A.2d 450 ("new trials are required only when
there is a knowing and intentional use of false evidence that is materi-
al") (citations omitted), as well as other due process cases with different
factual contexts, *id.* at 308, 473 A.2d 450 ("materiality must be shown
before a new trial is warranted") (citations omitted), and reached the
same conclusion.

**20.** Because, ultimately, Kopera's testimony as to some of his credentials
was not material, Kulbicki's trial counsel's failure to investigate Kop-
era's credentials does not amount to ineffective assistance.

*v. DeFronzo,* 59 Ohio Misc. 113, 394 N.E.2d 1027 (Ohio Ct.Com.Pl.1978) (falsification of credentials was deemed material where expert had neither the academic background nor experience he claimed).[21] Although Kulbicki correctly cites *Napue,* 360 U.S. at 269, 79 S.Ct. 1173, in stating that "[t]he principle that the State may not knowingly use false evidence ... does not cease to apply merely because the false testimony goes only to the credibility of the witness," he fails to acknowledge that credibility is not based on credentials alone. *See* Maryland Criminal Pattern Jury Instructions 3:14 (advising jurors that although the expert's "experience, training and skills, as well as the expert's knowledge of the subject matter" should be considered, they are "not required to accept any expert's opinion" and, rather, are free to "give expert testimony the weight and value [they] believe it should have").[22]

Citing *Stevenson,* 299 Md. at 308, 473 A.2d 450, Kulbicki urges us to consider the materiality of Kopera's entire testimony.[23] The portion of the *Stevenson* Court's opinion on which Kulbicki relies, however, is dicta.[24] Therefore, we need not engage in a similar analysis here.

---

**21.** Kulbicki also cites *State v. Elder,* 199 Kan. 607, 433 P.2d 462 (1967), but that opinion is inapposite. In *Elder,* the Supreme Court of Kansas did not employ the test we use in this case to determine whether an expert's perjured testimony was *material to the case before it.* Instead, the defendant, Lyle Elder, was on trial for *perjury* for having falsified his educational background while testifying as an expert in a *previous trial. Id.* at 463. The *Elder* Court therefore applied a much less stringent test for materiality than ours, to wit: "The false statements relied upon, however, need not bear directly on the ultimate issue to be determined; *it is sufficient that they relate to collateral matters upon which evidence would have been admissible." Id.* (emphasis added) (citations omitted).

**22.** The Pattern Jury Instruction was given in this case.

**23.** In particular, Kulbicki argues that Kopera was the only witness to testify that the damage in the truck was caused by a bullet fragment and that the revolver had been "cleaned." Kulbicki also contends that Kopera "was one of only two witnesses who ... linked Kulbicki to the murder with bullets."

**24.** In its written opinion, the *Stevenson* Court held that the knowing and intentional use of *false testimony* violates due process when *such*

As to Kulbicki's claims regarding the falsity of Peele's CBLA testimony, we agree with the State that "there was no indication that [Peele] questioned the validity of the matters he asserted or that his testimony was inaccurate or misleading." *See Brown v. State*, 225 Md. 610, 616, 171 A.2d 456 (1961) (describing perjury as " 'swearing falsely and corruptly, *without probable cause of belief* ") (quoting *Wharton*, Criminal Law, § 1511 (12th ed.1932), p. 1782) (emphasis added). Likewise, without the benefit of hearing testimony from Kopera himself during the postconviction proceeding, we cannot assume that his trial testimony regarding the gun's "cleaned" condition and the significance of "cannelures" did not reflect

---

*testimony* is material to the result of the case. *Stevenson*, 299 Md. at 305, 473 A.2d 450. The Court went on to address Stevenson's reliance on *People v. Cornille*, 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983), a case in which the State of Illinois had used testimony from the same expert as in *Stevenson*, and the Supreme Court of Illinois reversed the conviction when it came to light that the expert, "Michaelson," had lied about his academic credentials. *Stevenson*, 299 Md. at 308, 473 A.2d 450. In distinguishing *Cornille* from *Stevenson*, the Court addressed the *entirety* of the expert's testimony, rather than only the *false testimony* stated in the rule, above. The court stated:

In *Cornille*, it appears that the testimony as to the cause of the fire was evenly balanced, justifying the court's conclusion that Michaelson's testimony, plus his impressive academic background, was likely to have persuaded the factfinder of the defendant's guilt. On the other hand, in the case *sub judice*, the trial judge found evidence of appellant's guilt was overwhelming, even if Michaelson's testimony was not in the case, and he made this observation "beyond a reasonable doubt." Our review of the record confirms this observation.

*Id.*

However, there is nothing in this portion of *Stevenson* that expands the scope of the rule announced above, *id.* at 305, 473 A.2d 450, and it is entirely *consistent* with a rule limited to *false testimony*. (If the evidence in *Stevenson* was "overwhelming" without *any* of Michaelson's testimony, then it must be sufficient after subtracting only his *perjured* testimony.) We therefore would not presume that Kulbicki's proffered interpretation of *Stevenson* is anything more than dicta. Moreover, Kulbicki has not presented a case in which a defendant's conviction was reversed as a result of the admission of false testimony from Kopera, specifically, as Stevenson had done with regard to Michaelson. For these reasons, we need not, and shall not, apply Kulbicki's proposed interpretation of *Stevenson*, which would have us consider the sufficiency of the evidence *without any testimony* from Kopera.

his beliefs at the time of trial. Any evidence presented by Kulbicki showing otherwise was merely circumstantial and speculative. Finally, as Peele was not a state official and Kulbicki provided no evidence to show that any prosecutors knew about the unreliable nature of CBLA at the time of trial, Kulbicki's contention "comes down to the claim that his conviction was the result of false testimony," which "goes to credibility and so to the sufficiency of the evidence, a matter not available for post conviction relief." *Husk v. Warden, Md. Penitentiary*, 240 Md. 353, 356, 214 A.2d 139 (1965) (citing *Davis v. Warden*, 235 Md. 637, 201 A.2d 672 (1964)). *See also Berry*, 624 F.3d at 1043 (concluding that the NRC Report is no more than impeaching evidence of CBLA evidence introduced at trial, especially where the expert "was not accused of fabricating the results of any tests in this case, and there is no evidence that she committed perjury").

## III. Ineffective Assistance of Counsel

■ Kulbicki's final claim is that his trial counsel rendered ineffective assistance. According to Kulbicki, his attorneys should have consulted with scientific experts to investigate and challenge the State's ballistics and DNA evidence, and his attorneys should have objected to "the State's improper argument that Kulbicki's consultation with an attorney was evidence of guilt." In response, the State contends that Kulbicki failed to meet his burden of establishing ineffective assistance as to both claims.

■ " '[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Walker v. State*, 161 Md.App. 253, 262, 868 A.2d 898 (2005) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In order to prevail on an ineffective assistance claim, a defendant must satisfy the two-part test announced by the Supreme Court:

First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.... Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

With respect to the first part of the *Strickland* test, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. In that regard, all circumstances must be considered. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. Furthermore, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* (citation omitted). Therefore, in order to prevail, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

██ "Mere errors in trial tactics are not sufficient to constitute incompetency of counsel." *State v. Merchant,* 10 Md.App. 545, 551, 271 A.2d 752 (1970) (citations omitted). "Tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant." *Curtis v. State,* 284 Md. 132, 150, 395 A.2d 464 (1978) (footnote omitted).

██ In this case, we cannot say that the postconviction court erred when it held that Kulbicki's trial counsel acted reasonably. Both trial counsel were experienced criminal

defense attorneys, and one of them had the highly relevant experience of serving as co-counsel at Kulbicki's *previous trial* on the same charges. As the trial court explained, Kulbicki's counsel faced a strategic choice: challenge multiple independent scientific links to the victim—only some of which would be damaged by Kulbicki's present arguments—or challenge agency. Kulbicki's present arguments give us no reason to reject the trial court's conclusion that counsel reasonably chose to pursue the latter strategy, particularly where one of them had seen the evidence "play out once before at trial." None of the cases that appellant cites involved such a strategic choice or the knowledge gained from a previous trial. *See Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir.2005) ("[I]t is clear that in this case such a failure was not justified as an objectively reasonable strategic choice. Here, no facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession."); *Sims v. Livesay*, 970 F.2d 1575, 1580–81 (6th Cir.1992) ("We discern no strategy in [counsel]'s failure to investigate the role of the [evidence at issue], only negligence."); *Bowers v. State*, 320 Md. 416, 578 A.2d 734 (1990). And while we agree that the State's closing argument was improper,[25] we again cannot say that counsel's actions were anything other than a strategic decision not to call further attention to what it considered a damaging piece of evidence. In light of the particular facts of this case, we have no reason to disturb the trial court's ruling that Kulbicki's counsel acted reasonably. As Kulbicki failed to satisfy the first prong of the *Strickland* test, we need not consider the second prong. 466 U.S. at 697, 104 S.Ct. 2052 ("there is no reason for a court

---

**25.** The prosecution stated, in closing, that Kulbicki's decision to consult with an attorney and hire a private investigator "is a sign of a guilty man." This appears contrary to Maryland law, *Hunter v. State*, 82 Md.App. 679, 686, 573 A.2d 85 (1990) ("[I]t is impermissible for the State to offer evidence of, or comment upon, a criminal defendant's obtention of counsel or his attempt, request, or desire to obtain counsel in order to show a consciousness of guilt."), but is not the proper subject of postconviction relief, where the only question is whether *defense counsel reacted strategically* to the State's closing.

deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one").

For all of the foregoing reasons, we affirm the trial court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**