REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 2614
September Term, 2012

WILLIAM JACKSON

v.

STATE OF MARYLAND

Zarnoch,
Graeff,
Davis, Arrie W.
  (Retired, Specially Assigned),

JJ.

Opinion by Graeff, J.

Filed: February 28, 2014

This appeal involves a Petition for Writ of Actual Innocence filed by William Jackson, appellant, in the Circuit Court for Baltimore City, based on evidence that the State's ballistics expert, Joseph Kopera, lied about his qualifications. The circuit court denied appellant's petition, finding that appellant failed to meet his burden of proof pursuant to Md. Code (2011 Supp.) § 8-301(a)(1) of the Criminal Procedure Article ("C.P.").

On appeal, appellant presents the following question, which we have rephrased slightly, as follows:

Did the circuit court err in denying appellant's Petition for Actual Innocence where it was undisputed that (I) the State presented perjured testimony of a state expert witness as to his expert qualifications; (ii) the trial court explicitly instructed the jury that it must take into account the expert's qualifications; and (iii) the question of appellant's guilt was highly contested at trial?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 16, 1987, a jury sitting in the Circuit Court for Baltimore City convicted appellant of first-degree murder, first-degree sexual offense, and use of a handgun in the commission of a crime of violence. The circuit court imposed consecutive sentences of life imprisonment for the murder conviction, life imprisonment for the sexual offense conviction, and twenty years for the handgun conviction.

On December 20, 1986, Marcella Robinson was at the home of her boyfriend, Musa Bey. She testified that, at approximately 7:00 a.m., appellant came to Mr. Bey's apartment and asked to see Mr. Bey. Shortly thereafter, Ms. Robinson went upstairs and

found the two men using cocaine in one of the bedrooms. The three then smoked cocaine for forty-five minutes.

At approximately 7:45 a.m., Ms. Robinson advised the two men that she needed to get ready for work. She testified that appellant then fired a gun shot into the floor and said to Mr. Bey: "[G]ive me my cocaine." Appellant struck Mr. Bey in the head with the gun, fired a shot behind where Mr. Bey was seated, pulled a rope out of a brown bag, and tied up Mr. Bey. He then ordered Ms. Robinson, at gun point, to take off her clothes. Mr. Bey pleaded with appellant to leave Ms. Robinson alone, and he told appellant that he could not breathe. Appellant then picked Mr. Bey up off the floor and tied him to a chair.

Appellant told Ms. Robinson to perform oral sex on him or he would shoot her. Mr. Bey continued to yell at appellant to leave Ms. Robinson alone, so appellant put Mr. Bey in the closet. Appellant then took his clothes off, shut the door to the closet, and pulled Ms. Robinson into another room, where he urinated into her mouth and penetrated her vagina with his fingers after he was unable to do so with his penis. After returning to the room where Mr. Bey was being held in the closet, appellant urinated into a yellow bowl in the room and ordered Ms. Robinson to drink it.

Thereafter, Mr. Bey pushed the closet door part way open, and appellant turned and shot at the door. Appellant warned Mr. Bey that, if he came out of the closet, appellant would kill him. Mr. Bey then "came charging out of the closet," grabbed appellant by his

shirt, and appellant shot Mr. Bey.[1]  Mr. Bey fell onto appellant, and appellant hit Mr. Bey over the head with the gun.

At that point, Ms. Robinson ran from the room, down the steps, and outside, screaming for help.  Ms. Robinson was still naked at the time.  Mr. Bey's next-door neighbor brought her into the house and gave her clothes, and Ms. Robinson asked her to call the police because appellant had shot Mr. Bey.  The police arrived, and at approximately 1:30 p.m., Ms. Robinson was taken to the hospital, where she received an oral and vaginal exam.  On cross-examination, Ms. Robinson acknowledged that, while at the hospital, she did not advise the physician who treated her that appellant had assaulted her vaginally.

Thomas Simpson, an officer with the Baltimore City Police Department, testified that, on December 20, 1986, at 1:00 p.m., he received a call regarding a shooting at 414 East 21st

---

[1] On cross-examination, Ms. Robinson testified that appellant was undressed at the time he shot Mr. Bey, but when counsel questioned her about her testimony that Mr. Bey grabbed appellant's clothing, she stated:

[MS. ROBINSON]: Yes, sir.  Okay.  You are right , sir because – yes, sir.  You are absolutely right because when they were fussing, he walked back over and he put on his sweater and his jacket, yes sir.

You're absolutely right because that's the last thing I remember because when the police, by the time the police got there, that's what I told the police.  He put on a jacket.  He put a sweater on and his jacket because they were fussing and Musa said, you're a punk, you're a punk without a gun. . . .

You're absolutely right, sir. Yes, sir.  He did have on a sweater and a jacket.  Yes, he did.

Street. When he arrived, there was a crowd of five or six people in front of the residence, and he heard someone yell that someone was shot, and "a naked lady" had run into the house next door. While searching the residence, Officer Simpson found a person, who appeared to be dead, lying face down, bleeding from the head in a small bedroom on the second floor. Officer Simpson observed a kitchen chair in the closet of the room, with a rope wrapped around it. He also observed a bullet hole in the floor, as well as above the frame of the closet door. Evidence technicians recovered bullet fragments from the hole above the closet, as well as a bullet from the first floor.

Based on the shouting he heard upon arriving at the scene, Officer Simpson went to the residence next door, where he found Ms. Robinson. She was very upset, but he was able to obtain a statement from her.[2]

Robert Bowman, a Baltimore City Police Detective, testified that Ms. Robinson identified appellant as the shooter. When he went to the residence, he found a yellow bowl that smelled of urine in the bedroom where Mr. Bey's body was found.

Dr. William Zane, an Assistant Medical Examiner, testified that Mr. Bey died of a gun shot wound to his chest. Dr. Zane recovered the bullet from Mr. Bey's body, and he determined that the wound was consistent with a gun shot at close range. Mr. Bey had several lacerations on his scalp, which were consistent with being struck with part of a gun. Dr. Zane did not observe other abrasions on Mr. Bey's body. Although he commented that,

_____

[2] Ms. Robinson's statement was consistent with her testimony at trial.

-4-

where an individual is bound and struggles to free himself, there should be evidence of that struggle, the lack of such evidence in this case did not indicate that Mr. Bey was not bound. Regarding Mr. Bey's time of death, Dr. Zane testified as follows: "I have to refer to the notes. I would say . . . the early morning hours of the 20th of December." On cross-examination, while referring to his report, he stated that the time of injury was 12:45 p.m.

Mr. Kopera, an employee of the Baltimore City Police Department Ballistics Unit, testified as an expert in ballistics.[3] Mr. Kopera testified that he held a degree in mechanical engineering from the University of Maryland in College Park, as well as a mechanical engineering degree in photo-science from Rochester Institute of Technology in New York. Mr. Kopera opined that the bullet found in the floor of Mr. Bey's home was a .38 caliber special or a .357 semi-jacketed bullet, which could have been fired from "Smith and Wesson, I.N.A.[] Tiger, and Ruger revolvers."

Mr. Kopera also analyzed the victim's clothing to ascertain the distance between the victim and the muzzle of the weapon. Based on the residue on Mr. Bey's clothing, Mr. Kopera determined that the gun used to shoot Mr. Bey was fired from a range of three to four feet. After comparing the bullet fragments from the floor and Mr. Bey's body, he concluded that the bullets were fired from the same weapon.

Appellant testified that, on the morning of December 20, 1986, he went to Mr. Bey's apartment between 4:00 and 4:30 a.m., and left between 9:30 and 10:00 a.m. He smoked

---

[3] He was admitted as an expert without objection by defense counsel.

cocaine with Ms. Robinson and Mr. Bey, and while Mr. Bey was out of the house purchasing

more cocaine, appellant pulled his pants down and asked Ms. Robinson to perform oral sex.

When Mr. Bey returned and saw appellant and Ms. Robinson, Mr. Bey struck

Ms. Robinson and appellant. Mr. Bey backed Ms. Robinson into a corner, at which point she

pulled a gun from her pocket, and shot Mr. Bey.[4] Appellant then left Mr. Bey's apartment,

went home, got some money, and went to his brother's house, where he stayed until he turned

himself in on January 5, 1987.

Appellant called his girlfriend, Maria Ayala, as a witness for the defense.[5] She

testified that she had never told anyone that appellant wanted to hurt Mr. Bey, nor had she

said that he wanted to sleep with Ms. Robinson. To her knowledge, Ms. Robinson did not

have a sexual interest in appellant, and Ms. Robinson and appellant were not seeing each

other. On cross-examination, she acknowledged telling the police that, the night before

Mr. Bey was shot, she saw appellant and Mr. Bey talking in front of a club late in the

evening, that she had seen a gun at a store appellant owned, and that appellant was jealous

---

[4] Appellant believed that Mr. Bey was angry, not because appellant and Ms. Robinson engaged in a sexual act, but because Ms. Robinson and appellant had used cocaine without Mr. Bey.

[5] The State initially summoned Ms. Ayala as a State's witness. After learning that Ms. Ayala denied making statements attributed to her, the State requested that Ms. Ayala be declared a court's witness, enabling the State to call witnesses to rebut or refute her testimony. Appellant objected. He then informed the court that he intended to call Ms. Ayala as a witness, proffering that she would testify that she was aware of sexual activities between appellant and Ms. Robinson, as well as sexual activity between appellant, Mr. Bey, and Ms. Robinson. Defense counsel further proffered that Ms. Ayala would testify that appellant did not leave her residence on the day in question with a bag, rope, or gun.

-6-

of Mr. Bey. Ms. Ayala acknowledged that, the morning of the shooting, appellant had been at her apartment, but she denied telling Christine McCormick and Aimin Bey ("Aimin") that appellant left in a jealous rage, with a brown paper bag and a rope.

To rebut Ms. Ayala's testimony, the State called several witnesses. Prior to allowing the rebuttal witnesses to testify, the court advised that it would instruct the jury "not to regard this for the truth of what is being said, only to rebut the testimony of [Ms.] Ayala." The court then gave the following instruction:

> I am permitting this testimony . . . not to prove the truth of what was testified, but to give you enough information so you can make your mind up as to whether Ms. Ayala was telling the truth or not. I am not admitting it for truth, but rather as well, we will call it, for the matter of believability or credibility.

The court subsequently instructed the jury that, with respect to the testimony of the rebuttal witnesses, "you may again not consider it for truth, but rather how it affects you, do you believe these witnesses? Do you believe Ms. Ayala?"

Christina McCormick testified that, on December 20, 1986, after learning that Mr. Bey, the father of her son, had been shot, she went to Ms. Ayala's home. Ms. Ayala told her that appellant had been using drugs for several days, and he was acting "crazy and paranoid." Appellant believed that Ms. Ayala and Mr. Bey were having sex, and appellant "said he was going to do it to [Ms. Robinson] for spite." The morning of December 20, appellant had been pacing back and forth, and he left Ms. Ayala's house with a bag under his arm.

-7-

Aimin testified that, on December 20, 1986, after learning of Mr. Bey's death, he went to Mr. Bey's mother's home. When he arrived, he saw Ms. Ayala leaving the house across the street. She told him that appellant's behavior that morning "was bizarre and incoherent," he was on cocaine, and he was very jealous and preoccupied with the idea that Ms. Ayala was having sex with other people. Appellant told Ms. Ayala that "he would kill Musa and sexually assault" Ms. Robinson. Ms. Ayala told Aimin that appellant left carrying a bag.

As indicated, the jury convicted appellant of first-degree murder, first-degree sexual offense, and use of a handgun in the commission of a crime of violence. On June 10, 1987, appellant filed a Notice of Appeal with this Court. We dismissed the appeal on August 14, 1987, due to appellant's failure to file a record.

On February 26, 1988, appellant filed a Petition for Post Conviction Relief. On January 12, 1989, the circuit court granted appellant's motion, in part, allowing him to file a belated appeal. In a per curiam opinion, we affirmed appellant's conviction. *Jackson v. State*, No. 14, Sept. Term 1989 (Sept. 19, 1989).

On January 23, 1996, appellant filed an Amended Petition for Post Conviction Relief, which the circuit court denied on January 21, 2003. On September 14, 2006, appellant filed a Motion to Reopen Post Conviction Proceedings. The circuit court granted appellant's motion with respect to his request to file a belated modification of sentence and a belated review of sentence, but it otherwise denied his request to reopen the post conviction

proceedings. On September 17, 2007, the circuit court denied appellant's motion to reduce his sentence.

On December 12, 2011, appellant filed a Petition for Writ of Actual Innocence and Request for Hearing, arguing that he "discovered evidence that the State's ballistic expert, [Mr.] Kopera, intentionally misrepresented himself at [appellant's] trial," and "this evidence could not have been discovered in time to move for a new trial under Maryland Rule 4-331." He argued that this newly discovered evidence created "a substantial or significant possibility that the result [of his trial] would have been different," asserting that the State's case against him was based on the credibility of his testimony against Ms. Robinson's, and Mr. Kopera's testimony was "important because it purported to bolster Ms. Robinson's version of events."

On January 11, 2013, the court held a hearing on appellant's petition.[6] Appellant introduced into evidence the complete transcript of his 1987 trial, a news release dated March 8, 2007, from the Maryland State Police Department detailing the issues with Mr. Kopera's credentials, a newspaper article from *The Baltimore Sun* entitled "Police Expert Lied About Credentials," and a *USA Today* article entitled "Expert's Ruse Raises Legal Questions."[7] The evidence indicated that, contrary to Mr. Kopera's testimony at trial, he did not graduate from either the University of Maryland or Rochester Institute of Technology.

_____

[6] At the outset of the hearing, the court noted that a hearing initially was scheduled for September 2012, but the court granted appellant's request for a continuance to recover a missing transcript page.

[7] The three newspaper articles introduced at the hearing on appellant's petition were not submitted as part of the record on appeal.

Appellant and the State stipulated that appellant had no knowledge of Mr. Kopera's perjury during his trial, and "[h]e did not learn of those facts until 2010 when he was advised by a fellow inmate at the Department of Corrections."

Appellant argued that the evidence of Mr. Kopera's perjury was newly discovered evidence that created a substantial possibility that the result of his trial would have been different. He contended that it was not mere impeaching evidence because the court instructed the jury that "you must take into account the qualifications of the expert" and weigh his testimony. Thus, he argued, Mr. Kopera's qualifications became a material point of his testimony. He further contended that appellant's case hinged on credibility due to the two versions of events: his and Ms. Robinson's. He argued that, because Mr. Kopera's testimony bolstered Ms. Robinson's version of events, it was material to the case, as opposed to merely impeaching.

Appellant also argued that, at the time of trial, he could not have discovered Mr. Kopera's perjury with reasonable due diligence. He asserted that due diligence, as that term is known, "does not contemplate that defense attorneys or a defendant should perceive or conclude that a State witness" would testify falsely about his credentials, and the State's lack of knowledge regarding Mr. Kopera's false credentials demonstrates the difficulty in placing the burden on a defendant "to know and to then look for his perjury and his false statements."

With respect to the import of Mr. Kopera's testimony, appellant argued as follows:

What Mr. Kopera testified to is [] with respect to a shell casing that – or a – spent bullet that was found in the floor and the bullet that was in Mr. [Bey] that those matched. And that was consistent with Ms. Robinson's testimony. Also with respect to the positioning of where people were when Mr. [Bey] was shot based on powder residue analysis that was done by Mr. Kopera suggested that it was within three-to-four feet and so that would have been again, that is consistent with what Ms. Robinson had testified to. And in fact, the State makes that argument to the jury that the evidence, that the forensic evidence, the evidence from the ballistics expert are consistent with Ms. Robinson's testimony in the case. And because of that you should believe Ms. Robinson's version. I mean, that's the argument that has been made to the jury.

The State argued that the "false testimony regarding qualifications" was "merely impeaching." Moreover, contrary to appellant's contention, the case against him was not close: "We have an eye witness [sic] who knew the victim and who testified clearly and without hesitation that it was [appellant] that . . . committed the crime."

With respect to appellant's argument that Mr. Kopera's perjury bolstered Ms. Robinson's testimony, the State argued that this contention was without merit and merely an "attempt to retry the case." It argued that, at trial, "almost all of the time was spent talking about everybody else's testimony but Mr. Kopera." It stated that, even if Mr. Kopera's testimony that the bullet in the floor was consistent with having been fired from the same gun that killed the victim corroborated Ms. Robinson's version of what happened, this "small amount of corroboration" did not directly implicate appellant, nor did it call the verdict into question. The State contended that, even with the evidence of Mr. Kopera's perjury, the outcome of trial would not have been different, and accordingly, the court should deny appellant's petition.

On February 6, 2013, the circuit court issued a Memorandum and Opinion denying appellant's petition. The court first addressed whether the evidence was "newly discovered," noting that it must determine: (1) whether the petitioner exercised due diligence in seeking to discover the evidence; and (2) whether the evidence was material rather than "merely cumulative or impeaching." In this regard, the court found as follows:

> [T]he [c]ourt concludes that the expert's falsification of his academic credentials is mere impeachment evidence. The evidence impeaches the ballistics expert's educational background, not the accuracy or reliability of his examination of the bullets. Additionally, the expert's educational embellishments are collateral details that do not go to the core question of [appellant's] guilt or innocence. . . . The evidence is consequently "merely impeaching" and not newly discovered.
>
> Given that another attorney was able to discover the misstatements, one may also conclude that [appellant] did not exercise due diligence in obtaining this readily available evidence at the time of his trial.

The court noted that, even if the evidence was newly discovered, the petition could be granted only if it created "a substantial or significant possibility" that the result may have been different. In finding that this showing had not been made, the court stated as follows:

> [Appellant] argues that the evidence presented at his trial was far from overwhelming and that the [c]ourt's jury instructions rendered the expert's educational qualifications material to the jury's ultimate verdict. The [c]ourt does not agree. At [appellant's] trial, the jury heard ample evidence independent from the expert's testimony that would support a conviction for first-degree murder, first-degree sexual offense, and use of a handgun in the commission of a crime of violence. The victim's girlfriend in this case provided key eyewitness testimony. Specifically, the girlfriend testified that [appellant] had locked the victim in the closet while he sexually assaulted her and then shot the victim when he eventually broke free. She further testified that after the shooting, she broke the front door's chain lock and window, fled the house in the nude, and then shouted for help from the neighbors. This

-12-

testimony was corroborated at trial. The police also found rope wrapped around a chair in the closet and the extension cord that was used to restrain the victim's girlfriend.

The court also noted that the jury heard testimony from appellant's girlfriend, "who testified that on the day of the incident, [appellant] was drugged and in a highly agitated state when he left for the victim's house," and that appellant "said he was going to sexually assault the victim's girlfriend."

Ultimately, the court concluded that the evidence regarding Mr. Kopera's credentials "does not create a substantial or significant possibility that a jury may not have convicted [appellant] at his 1987 trial." Accordingly, it denied his Petition for Writ of Actual Innocence.

This timely appeal followed.

## DISCUSSION

Appellant argues that the circuit court erred in denying his Petition for Writ of Actual Innocence, asserting that it was undisputed that "(i) the State presented perjured testimony of a State expert witness employed by the Baltimore City Police Department as to his expert qualifications, (ii) the jury was explicitly instructed that it must take into account the expert's qualifications and (iii) the question of [appellant's] guilt was highly contested." Specifically, he contends that Mr. Kopera's perjury was newly discovered evidence, as opposed to "merely impeaching" evidence, and he acted "with reasonable diligence in discovering Mr. Kopera's

perjury." He argues that the evidence of Mr. Kopera's perjury "raises a substantial or significant possibility that the trial result may have been different."

The State contends that the circuit court properly denied appellant's petition. It asserts that: (1) the evidence was not "'newly discovered' because it could have been discovered through the exercise of due diligence prior to trial"; (2) the evidence was "merely impeaching and not exculpatory"; and (3) the evidence "does not give rise to a possibility of a different result in [appellant's] trial."

## A.

### Petition for Writ of Actual Innocence

In 2009, the General Assembly enacted C.P. § 8-301, which permits a defendant to file a Petition for Writ of Actual Innocence. It provides, in pertinent part, as follows:

*Newly Discovered Evidence*

**§ 8-301. Petition for writ of actual innocence.**
(a) *Grounds.* — A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
(1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.[8]

---

[8] Maryland Rule 4-331(c) provides, in relevant part, that a court may grant a new trial on the ground of newly discovered evidence if the motion is "filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate
(continued...)

-14-

*** 

(g) *Burden of proof.* A petitioner in a proceeding under this section has the burden of proof.

There have been only three appellate opinions addressing a petition filed pursuant to this statute. *See Douglas v. State*, 423 Md. 156, 163 (2011); *State v. Matthews*, 415 Md. 286, 290 (2010); *Keyes v. State*, ___ Md. App. ___, No. 2552 Sept. Term 2011, slip op. at 5 (filed Jan. 28, 2014). None, however, has addressed the merits of the petition.

In *Matthews*, 415 Md. at 297-98, the Court of Appeals held that, given the enactment of the statute during the pendency of the case, and the lack "of rules of procedure to guide the process," Matthews' untimely motion for a new trial should be treated as a Petition for Writ of Actual Innocence.[9] Whether the petition satisfied the requirements of the statute was left for the circuit court to address. *Id.* at 312-13.

In *Douglas*, 423 Md. at 163-64, the Court addressed whether the denial of a Petition for Writ of Actual Innocence is a final judgment. It held that it was, and therefore, it was an immediately appealable order. *Id.* at 177.

---

[8](...continued)
issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief," and the evidence could not have been discovered by due diligence earlier.

[9] Maryland Rule 4-332, which became effective on October 1, 2011, now addresses the procedure to follow in filing a Petition for Writ of Actual Innocence. *Douglas v. State*, 423 Md. 156, 182 n.14 (2011); *Keyes v. State*, ___ Md. App. ___, No. 2552 Sept. Term 2011, slip op. at 6 n.3 (filed Jan. 28, 2014).

In addressing this issue, as well as whether Douglas satisfied the pleading requirements and was entitled to a hearing, the Court discussed the purpose of C.P. § 8-301. It noted that the statute "provides a defendant an opportunity to seek a new trial based on newly discovered evidence that speaks to his or her actual innocence, as evident from the title of the statute." *Id*. at 176. The Court explained that the legislative history of § 8-301 "reflects a legislative purpose that the statute extend the right to seek a new trial on the basis of newly discovered evidence beyond that afforded a convicted defendant under Maryland Rule 4–331(c)." *Id*.

In *Douglas*, the alleged newly discovered evidence similarly involved Mr. Kopera's falsified credentials. *Id*. at 185-86. The Court noted that the newspaper article submitted as an exhibit stated that "the chief attorney with the . . . Innocence Project . . . became concerned about [Mr.] Kopera's qualifications while reviewing transcripts and noting inconsistencies regarding the credentials he testified he had earned." *Id*. at 185. The Court held, as a procedural matter, that "viewing inferences in the light most favorable to Douglas, it *could be* that the evidence could not have been discovered within time to move for a new trial under Rule 4–331." *Id*. at 186 (emphasis added). The Court noted, however, that although Douglas satisfied the pleading requirement, and therefore, was entitled to a hearing on his petition, "it does not follow automatically that he can prove his claim." *Id*. Rather, the ultimate decision on the merits of a request for a new trial based on newly discovered evidence, "whether filed pursuant to Rule 4-331 or C.P. § 8-301," was a matter "committed

-16-

to the hearing court's sound discretion." *Id*. at 188. *Accord Miller v. State*, 380 Md. 1, 28 (2004) (denial of motion for a new trial based on newly discovered evidence reviewed for abuse of discretion).

In this case, unlike in *Douglas*, *Matthews*, and *Keyes*, the merits of the petition are before us. Thus, we will address whether the circuit court properly exercised its discretion in denying the petition. In this regard, we note that a ruling generally will not be deemed to be an abuse of discretion unless it is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Moreland v. State*, 207 Md. App. 563, 569 (2012) (quoting *Gray v. State*, 388 Md. 366, 383 (2005)). *Accord Morris v. State*, 204 Md. App. 487, 492 (2012) (This Court will find an abuse of discretion only "'where no reasonable person would take the view adopted by the [trial] court.'") (quoting *King v. State*, 407 Md. 682, 697 (2009)).

The statute, by its terms, requires a defendant to show two things to prevail on a Petition for Writ of Actual Innocence: (1) newly discovered evidence that "could not have been discovered in time to move for a new trial under Maryland Rule 4-331"; and (2) that the evidence "creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." We will address each of these requirements in turn.

**B.**

**Due Diligence**

As indicated, a defendant filing a petition for writ of actual innocence must first show newly discovered evidence that "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." C.P. § 8-301(a)(2). This is "a threshold question," and until there is a finding of newly discovered evidence that could not have been discovered by due diligence, no relief is available, "'no matter how compelling the cry of outraged justice may be.'" *Argyrou v. State*, 349 Md. 587, 604 (1998) (quoting *Love v. State*, 95 Md. App. 420, 432 (1993)). Due diligence has been defined as acting "reasonably and in good faith." *Id.* at 605.

Here, appellant must show that evidence regarding Mr. Kopera's education could not have been discovered through the exercise of due diligence prior to October 1990. That date is based on the requirement of Rule 4-331, now and in 1987, that a motion for new trial due to newly discovered evidence be filed within one year after the later of sentencing or the issuance of a mandate issued by the appellate court, and that this Court issued the mandate in October 1989.

The circuit court ruled against appellant on the issue of due diligence, finding it significant that an assistant public defender had discovered that Mr. Kopera did not earn degrees in engineering or attend the University of Maryland or Rochester Institute of Technology. The court found:

Given that another attorney was able to discover the misstatements, one may also conclude that [appellant] did not exercise due diligence in obtaining this readily available evidence at the time of his trial.

As discussed below, we perceive no abuse of discretion in this finding.

This Court addressed a similar issue, albeit in a different context, in *Kulbicki v. State*, 207 Md. App. 412, *cert. granted*, 430 Md. 344 (2012).[10] In that case, which involved an appeal from a denial of post-conviction relief pursuant to C.P. § 7-101, we held that Kulbicki waived his contention relating to Mr. Kopera's false testimony because the accuracy of his alleged credentials could have been discovered prior to trial, and therefore, it could have been raised on appeal. *Id*. at 437.

In this case, we agree that Mr. Kopera's educational background could have been discovered prior to appellant's trial. That is shown by the fact that another attorney discovered it. Indeed, checking an expert's credentials is reasonable trial preparation. *See* Hilary Sheard, *Capital Cases*, CHAMPION, January/February 2000, at 52, 56 ("Taking any expert's *curriculum vitae* at face value is ill advised — allow time to call each institution where the expert has studied . . . and every professional organization of which he is a member. . . . Use data bases such as *Westlaw* and *Lexis-Nexis*, use the Internet, conduct courthouse searches.").

Although there may have been reasons that counsel did not pursue an investigation into Mr. Kopera's credentials, the circuit court did not abuse its discretion in finding that

---

[10] Oral argument in the Court of Appeals was held on October 3, 2013.

appellant failed to show that the evidence could not have been discovered in the exercise of due diligence. *See Jackson v. State*, 164 Md. App. 679, 690 (2005) (In analyzing whether newly discovered evidence could have been found using due diligence, "[t]he test, of course, is whether the evidence was, in fact, discoverable and not whether the appellant or appellant's counsel was at fault in not discovering it."), *cert. denied*, 390 Md. 501 (2006). Appellant's Petition for Writ of Actual Innocence was properly denied on this ground alone.

## C.

### Impact of the Evidence

Even if we agreed with appellant that the evidence could not have been discovered with due diligence, appellant still would have to show the next requirement, that the evidence created "a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." C.P. § 8-301(a)(1). This prong of the analysis involves a determination regarding the impact of the evidence.

With respect to this prong of the analysis, the Court of Appeals has explained, in the context of determining whether newly discovered evidence warrants a new trial under Rule 4-331, that courts should undertake a two-part inquiry. First, the court should assess whether the evidence is material to the result. *Stevenson v. State*, 299 Md. 297, 302 (1984). If that question is answered in the affirmative, the court inquires "into the possible impact the newly discovered evidence would have on the outcome of the trial." *Id. Accord Campbell v. State*, 373 Md. 637, 666-67 (2003) ("In order for the newly discovered evidence to warrant a new

trial, the trial judge must find it to be both material and persuasive such that '[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.'") (quoting *Yorke v. State*, 315 Md. 578, 588 (1989)).[11]

**1.**

**Materiality**

Thus, we assess first whether the evidence here was material. To be material, evidence must be more than "merely cumulative or impeaching." *Argyrou*, 349 Md. at 601; *Love v. State*, 95 Md. App. 420, 432, *cert. denied*, 331 Md. 480 (1993). In *Jackson*, 164 Md. App. at 697-98, Judge Moylan, writing for this Court, explained the distinction between evidence that is impeaching and evidence that is "merely impeaching," a distinction that, "albeit nuanced, is pivotally important":

> Newly discovered evidence that a State's witness had a number of convictions
> for crimes involving truth and veracity or had lied on a number of occasions
> about other matters might have a bearing on that witness's testimonial
> credibility, but would not have a direct bearing on the merits of the trial under

---

[11] Appellant suggests that the standard for granting a new trial based on a Petition for Writ of Actual Innocence is broader than that pursuant to Rule 4-331, noting that the Court of Appeals in *Douglas*, 423 Md. at 177, stated that the remedy pursuant to Rule 4-331 was "more restrictive." We construe this language to refer to the more restrictive time frame provided in Rule 4-331. Indeed, we recently held that, when interpreting Md. Code (2011 Supp.) § 8-301 of the Criminal Procedure Article, we should look to cases "interpreting and applying Maryland Rule 4-331." *Keyes*, slip op. at 19-20. *See also* LETTER FROM THE OFFICE OF THE PUB. DEF. TO SEN. DELORES GOODWIN KELLEY at 1 (S.B. 486 (2009 Sess.)) (stating that the standard for a Petition for Writ of Actual Innocence is the same as that pursuant to Rule 4-331(c)).

-21-

review. Such evidence would constitute collateral impeachment and would, therefore, be "merely impeaching." If the newly discovered evidence was that the State's witness had been mistaken, or even deliberately false, about inconsequential details that did to go to the core question of guilt or innocence, such evidence would offer peripheral contradiction and would, therefore, be "merely impeaching." If the newly discovered evidence, on the other hand, was that the State's witness had actually testified falsely on the core merits of the case under review, that evidence, albeit coincidentally impeaching, would be directly exculpatory evidence on the merits and could not, therefore, be dismissed as "merely impeaching."

This Court held that evidence that is merely impeaching does not permit "an appellate court to hold that a trial judge abused his discretion in denying a new trial motion resting on such a predicate." *Id*. at 699.

Here, as indicated, the circuit court determined that the falsification of Mr. Kopera's academic credentials impeached "his educational background, not the accuracy or reliability of his testimony." It stated that Mr. Kopera's "educational embellishments are collateral details that do not go to the core question of [appellant's] guilt or innocence," and "[t]he evidence is consequently 'merely impeaching.'"

As appellant notes, in support of this finding, the court relied on this Court's decision in *Kulbicki*, 207 Md. App. at 427, where Mr. Kopera testified that a bullet fragment in Kulbicki's truck was consistent with a .38 caliber gun or larger, that the damage to his truck was caused by a bullet fragment, and that Kulbicki's gun had been cleaned. Kulbicki, who was convicted of murder, filed a post-conviction petition alleging that Mr. Kopera committed perjury in testifying that he attended the University of Maryland and Rochester Institute of

Technology, and he falsified documents to conceal his false statements regarding his educational background. *Id.* at 429.

At the hearing on Kulbicki's post-conviction petition, the State stipulated that Mr. Kopera had lied about his credentials at trial. *Id*. at 430. Kulbicki then presented the testimony of John Nixon, an expert in firearms and ballistics, to discredit the substance of Mr. Kopera's testimony. *Id*. Mr. Nixon testified that, contrary to Mr. Kopera's opinion, it was not possible to determine what damaged Kulbicki's truck. He further opined that Kulbicki's gun did not fire the bullet fragment, which most likely came from a .32 caliber weapon. *Id.*

This Court determined, after finding that Kulbicki's post-conviction claim regarding Mr. Kopera's testimony was waived because "a background investigation would have revealed that [Mr.] Kopera lacked the claimed college degrees," that Kulbicki's claim failed on the merits because the falsity of the testimony was not material. *Id*. at 446. Specifically, we agreed with the circuit court that "'there simply is no likelihood that the jury's determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed.'" *Id*. at 447. We agreed with the State that the record reflected that "'ballistics is a field for which no college degree is offered, and the expertise for the field is usually based on experience, which [Mr.] Kopera had in copious amounts.'" *Id*.

We similarly hold here that the newly discovered evidence of Mr. Kopera's false testimony regarding his credentials was not material, but merely impeaching. There is no contention that Mr. Kopera's testimony regarding his ballistics analysis was false or incorrect. Rather, the newly discovered evidence alleged in the petition was limited solely to evidence that Mr. Kopera did not attend the University of Maryland or Rochester Institute of Technology. Thus, pursuant to this Court's analysis in *Jackson*, this evidence constitutes collateral impeachment and is not material. *See Jackson*, 164 Md. App. at 697 ("Newly discovered evidence that a State's witness . . . lied . . . on matters [that] might have a bearing on that witness's testimonial credibility, but would not have a direct bearing on the merits of the trial under review. Such evidence would constitute collateral impeachment and would, therefore, be 'merely impeaching.'").

Appellant argues, however, that the court's jury instructions caused the jury to place more weight on Mr. Kopera's falsified credentials by directing the jury that it "must take into account the qualifications of the expert" and give weight to the expert's testimony in accordance with the jury's perception of the expert's qualifications. At the conclusion of appellant's case, the court instructed the jury, in pertinent part, as follows:

> Now, there are two things you are to know about with regard to expert evidence rules, and they are, you must take into account the qualifications of the expert. If you feel the expert has really good qualifications, you are more inclined to give more weight to the testimony of the expert. If on the other hand you do not feel they have such great educational background or

qualifications, you don't have to give such weight or indeed any weight to the testimony of experts.[12]

Secondly, you may and should pay attention to the reasons given by the experts for the opinion. If the reasons appeal to you, make sense to you, then, naturally you will give more credence to the opinion of the expert than otherwise. You should otherwise base your evaluations of expert testimony on the same credible factors that I have just mentioned.

This instruction could be problematic in a different case. In this case, however, Mr. Kopera testified to his extensive experience in ballistics. He testified that he completed a five-year apprenticeship in ballistics and firearm identification, he was a graduate of the FBI Academy in the same discipline, and he had graduated a week earlier from the FBI Academy in the field of "specialized techniques" and ballistics. He further testified that "[t]here are no universities or colleges here in the United States that offer a degree, specifically, in the field of firearm identification or ballistics." As this Court noted in *Kulbicki*, 207 Md. App. at 447, "ballistics is a field for which no college degree is offered, and the expertise for the field is usually based on experience, which [Mr.] Kopera had in copious amounts."

Accordingly, we are unpersuaded that the court's jury instructions on expert witness testimony rendered the newly discovered evidence on Mr. Kopera's credentials material. We agree with the State that Mr. Kopera's claim "to have college degrees that he did not actually

---

[12] Dr. William Zane was admitted, by stipulation of the parties, as an expert in forensic pathology. Dr. Janice Johnson, who examined Ms. Robinson on December 20, 1986, was admitted, by stipulation of the parties, as an expert in gynecology.

possess has nothing whatsoever to do with the accuracy of his conclusion concerning the distance [Mr.] Bey was from the gun when he was shot," and that a bullet fragment found on the first floor was fired from the same gun used in the murder. The circuit court did not abuse its discretion in finding that the newly discovered evidence was not material. This finding alone is sufficient to affirm the circuit court's ruling.

**2.**

**Possibility of Different Result**

After finding that the evidence could have been discovered with due diligence and was merely impeaching, the court went on to consider the last prong of the analysis, whether there was "a substantial or significant possibility that the result may have been different." C.P. § 8-301.[13] The Court of Appeals has made clear that a new trial based on newly discovered evidence will not be granted unless the evidence "may well have created a different result, that is, there was a substantial or significant possibility that the [decision] of the trier of fact would have been affected." *Evans v. State*, 382 Md. 248, 264 (2004) (quoting *Campbell v. State*, 373 Md. 637, 666-67 (2003)).

In that regard, the circuit court stated:

---

[13] Appellant contends that the circuit court erred in concluding that the evidence "does not create a substantial or significant possibility that the trial result <u>would</u> have been different." He asserts, without support, that "[t]here is a significant difference between the result that <u>would</u> have been different with one that merely <u>may</u> have been different." We disagree that the court used the wrong standard. Although the court did use "would have been different" language in one sentence of its order, it subsequently quoted the "result may have been different" standard set forth in the statute.

[Appellant] argues that the evidence presented at his trial was far from overwhelming and that the [c]ourt's jury instructions rendered the expert's educational qualifications material to the jury's ultimate verdict. The [c]ourt does not agree. At [appellant's] trial, the jury heard ample evidence independent from the expert's testimony that would support a conviction for first-degree murder, first-degree sexual offense, and use of a handgun in the commission of a crime of violence. The victim's girlfriend in this case provided key eyewitness testimony. Specifically, the girlfriend testified that [appellant] had locked the victim in the closet while he sexually assaulted her and then shot the victim when he eventually broke free. She further testified that after the shooting, she broke the front door's chain lock and window, fled the house in the nude, and then shouted for help from the neighbors. This testimony was corroborated at trial. The police also found rope wrapped around a chair in the closet and the extension cord that was used to restrain the victim's girlfriend.

The court also noted that the jury heard testimony from appellant's girlfriend, "who testified that, on the day of the incident, [appellant] was drugged and in a highly agitated state when he left for the victim's house," and that appellant "said he was going to sexually assault the victim's girlfriend."[14]

Appellant contends that the court erred by applying a sufficiency of the evidence standard. He asserts that the proper analysis is "the effect that the perjured testimony had on the outcome of [his] trial." The State, by contrast, argues that the test "is not 'what the jury

---

[14] The above testimony referred to by the court was not admitted through Ms. Ayala, appellant's girlfriend, but rather, through the State's rebuttal witnesses, whose testimony was admitted only to allow the jury to assess Ms. Ayala's credibility. Although the court misstated that testimony, as discussed *infra*, the evidence properly before the jury was more than sufficient to convict appellant, even without Mr. Kopera's testimony, and it supported the court's finding that there was no substantial or significant possibility that the newly discovered evidence may have created a different result.

would have done if it knew that a witness testified falsely,' but rather, 'what would the jury have done if it had not heard the false evidence.'" (Quoting *Stevenson*, 299 Md. at 304-05).

In *Kulbicki*, 207 Md. App. at 447, this Court looked to the weight of the evidence after subtracting the perjured testimony. We held, in the context of a post-conviction petition, that there was "no likelihood that the jury's determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed," noting that the expertise for ballistics is usually based on experience, "which [Mr.] Kopera had in copious amounts."

In this case, applying that analysis, there is not a significant or substantial possibility that a jury may have reached a different result without the false testimony regarding Mr. Kopera's college degrees. As indicated, there is no college degree in ballistics, and Mr. Kopera's relevant experience was his experience in the field and with the FBI Academy, none of which is disputed. His college degrees were not particularly relevant to ballistics, the focus of his testimony, and therefore, a correct statement of Mr. Kopera's qualifications would not have altered the result of the trial.

Even assuming that the test is as appellant asserts, and we assume that the jury, having knowledge of Mr. Kopera's false testimony, would have discounted Mr. Kopera's testimony entirely, appellant still would not prevail. Mr. Kopera's substantive testimony in this case was limited. His testimony as an expert in ballistics was that the gun used to shoot Mr. Bey was fired from a range of three to four feet, and the bullet in the floor matched the one found

in Mr. Bey. Although the prosecution cited this testimony,[15] defense counsel did as well. During defense counsel's closing argument, he cited Mr. Kopera's testimony in support of appellant's version of events, arguing that there was evidence "that the shot took place within a three to four feet radius," but appellant was "across the room, not three to four feet from [Bey]." Thus, Mr. Kopera's substantive testimony did not weigh heavily in favor of either the State or the defense.[16]

---

[15] In its closing, the State made the following arguments regarding Mr. Kopera's testimony:

> The ballistics expert, Mr. Kopera, told you that the bullet that was fired in that floor, and the bullet that was fired into Musa Bey's chest was a perfect match. The first shot that [appellant] fired from that gun terrorized two people. The last shot that he fired from that gun, before leaving, killed one person. That one person was Musa Bey. Now, Mr. Kopera also told you that based upon his examinations, and his tests that it was very close range, within three to four feet. When this shot was fired into Musa's chest, he was about three or four feet from [appellant], and with every effort he had, he was still fighting for his life and for [Ms. Robinson's].

During rebuttal, the prosecutor noted that the room where Mr. Bey was killed was "a fairly small room," that was "ten by ten or eight by ten," so appellant would have been within the requisite distance when he fired the gun.

[16] Appellant cites several cases holding that, where expert testimony is critical, false testimony about the expert's credentials requires a new trial. *See United States v. Jones*, 84 F. Supp. 2d 124, 126 (D.D.C. 1999) (testimony of expert witness who lied about his education and qualification was material as it "filled in all of the gaps of the government's case," and without his testimony, "the independent evidence against Jones is highly circumstantial," such that a new trial was warranted); *People v. Cornille*, 448 N.E.2d 857, 859, 866 (Ill. 1983) (expert's false testimony regarding his credentials, where expert's testimony was "crucial" in light of evenly balanced evidence, constituted a violation of Cornille's due process rights and warranted a new trial). As indicated, Mr. Kopera's testimony was not critical in this case.

We agree with the circuit court that the evidence of appellant's guilt, without Mr. Kopera's testimony, was compelling.  As the circuit court noted, Ms. Robinson provided "key eyewitness testimony" that appellant tied up and locked Mr. Bey in a closet, sexually assaulted her, and then killed Mr. Bey when he broke free.  Ms. Robinson then fled the house naked, shouting for help from the neighbors.  This testimony, as well as other details of Ms. Robinson's testimony, was corroborated by other witnesses.  Several police officers who responded to the scene observed a chair and rope, as well as a bowl on the room of the floor where Mr. Bey's body was found that smelled of urine.  There also was testimony that neighbors were shouting that they saw a naked woman run out of the house.

Given the totality of the evidence against appellant, and the limited scope of Mr. Kopera's testimony, the circuit court did not abuse its discretion in finding that the newly discovered evidence did not "create[] a substantial or significant possibility that the result may have been different."  C.P. § 8-301.  The circuit court properly denied the Petition for Writ of Actual Innocence.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

-30-