*497 BARBERA, C.J.
Maryland law affords persons convicted of certain crimes the chance to obtain a new trial based on “newly discovered evidence” that “creates a substantial or significant possibility” that the result of the trial would have been different. The vehicle for obtaining such relief is a Petition for Writ of Actual Innocence. See Md. Code Ann., Crim. Proc. § 8-301(a)(1) (2010, 2008 Repl. Vol., 2015 Supp.).[1] Petitioner Robert MeGhie is serving a life sentence for murder and related offenses stemming from a 1994 failed armed robbery. In 2013, Petitioner filed a petition under § 8-301, basing it on newly discovered evidence that the State’s ballistics expert, Joseph Kopera, testified falsely about his academic credentials at Petitioner’s trial. Following a hearing on the petition, the Circuit Court for Montgomery County denied relief, concluding that Kopera’s lies about his academic credentials did not create a substantial or significant possibility of a different outcome at trial. The Court of Special Appeals affirmed the judgment of the Circuit Court. McGhie v. State, 224 Md.App. 286, 288, 120 A.3d 828 (2015). We, in turn, affirm the judgment of the Court of Special Appeals.
r — I

The Trial and Appeal

Petitioner was tried before a jury in the Circuit Court for Montgomery County. The State proceeded on charges of murder, attempted murder, two counts of use of a handgun during the commission of a crime of violence, and conspiracy to commit armed robbery. The target of the planned robbery was the American Mailbox, a business located in Silver Spring, Maryland that provides mailing services to customers. Much of the State’s evidence of Petitioner’s involvement in the crimes was presented through the testimony of one of the co-conspirators to the robbery, Edward Borrero.
*498 Borrero, sixteen years old at the time of trial, testified pursuant to a plea agreement.[2] His testimony was lengthy and detailed. According to Borrero, at 2:30 p.m. on January 31, 1994, he called a man known to him as “Mike.”[3] After the call, Borrero and his friend, then-sixteen-year-old Terrance Robinson, went to Mike’s apartment on 19th Street in Washington, D.C., arriving around 3:00 p.m. or sometime shortly thereafter. Mike talked with Borrero and Robinson about “a little store that [they] could hit.” In discussing a plan for the robbery, Mike drew a blueprint of the American Mailbox and told the two teenagers that there was $40,000 to $80,000 in cash in the back office.
Petitioner arrived at the apartment a few minutes later. Shortly thereafter, he, Mike, Borrero, and Robinson drove in a Chevrolet Celebrity (“the Celebrity”) to an apartment where Mike retrieved a 9-millimeter chrome handgun. Mike then returned to the car, accompanied by his girlfriend, Angie. An acquaintance of Mike, Earl (“Skinny”) Patterson, was waiting together with the others. Mike handed Borrero the handgun, and Skinny gave Borrero the keys to a Chrysler New Yorker (“the New Yorker”).
With Borrero driving the New Yorker, and Petitioner, Mike, Angie, and Robinson in the Celebrity, the group traveled in the direction of the American Mailbox. The trip was interrupted by a detour to take Angie back to the apartment, as she had decided not to participate in the planned robbery. After dropping her off, Borrero joined Petitioner, Mike, and Robinson in the Celebrity. They drove together to view the exterior of the American Mailbox and discuss the robbery plan. Once the plan was set, the four men retrieved the New Yorker.
*499 The four men then drove separately in the two cars to the apartment of Vanessa Hood. There, Mike collected a .38 revolver and handed it to Borrero. Borrero opted to use the chrome pistol and passed the revolver to Robinson. Borrero and Robinson then drove the Celebrity to the American Mailbox, while Mike and Petitioner drove the New Yorker to a spot a few blocks from the store.
Borrero and Robinson entered the American Mailbox. Bor-rero, with a book of stamps in hand, approached the counter where the storekeeper, Joseph Atkins, was speaking on the telephone. When the call ended, Borrero pulled out a gun. Atkins reached across the counter to defend himself, and Borrero shot him in the face.
Borrero and Robinson then searched, without success, for the money. As they were doing that, a storekeeper from down the street, Randall Covington, entered the American Mailbox. Borrero shot him as well. Covington died of the gunshot wound.
Borrero and Robinson fled the store and drove in the Celebrity to meet Mike and Petitioner, who were waiting in the New Yorker. The four abandoned the Celebrity on the street and drove in the New Yorker to Hood’s apartment. At the apartment, Mike left the two guns -with Hood. About ten minutes after their arrival, a young man, later determined to be Hood’s son, Vandell Roseman, entered the apartment. Soon thereafter, Petitioner, Mike, and Roseman left the apartment. Borrero and Robinson remained at the apartment watching television, then left after seeing a news report about the shooting.
Borrero further testified that he was arrested on February 8,1994, and at that time told a different story to the police. In that interview, he reversed Mike’s and Petitioner’s participation in the crime and reversed his role with that of Robinson.
The State called Hood and her son, Roseman, each of whom corroborated aspects of Borrero’s testimony. Hood testified that, on January 31, 1994, around 3:30 p.m. to 4:00 p.m., *500 Petitioner and Mike came to her apartment, which is about a fifteen-minute drive from the American Mailbox, to collect a gun that Mike had left there. The gun was brown and black and had a cylinder in the middle. About thirty to forty-five minutes later, Petitioner and Mike returned to her house with two boys. Hood testified that they must have arrived sometime before 5:00 p.m. because she was watching the Oprah Winfrey show, which airs from 4:00 p.m. to 5:00 p.m. Mike gave her two guns and asked her to keep them; one gun was the brown and black gun that Mike had picked up earlier that afternoon and the other gun was flat and silver. Ten to fifteen minutes later, Roseman came home but left sometime thereafter. Like Borrero, Hood testified that the two boys were watching television at Hood’s apartment for a time but left after they watched a news report about a shooting nearby. About two to three days after the incident, Hood decided that she did not want the guns in her home and gave them to Roseman to discard.
Roseman testified that, on January 31, 1994, he came home around 5:00 or 6:00 in the evening and saw Petitioner, Mike, and two boys. At Petitioner’s request, Roseman drove him to the American Mailbox. When upon arrival they saw that police were surrounding the area, Petitioner told Roseman to “forget it and just to go back home.” Roseman’s mother instructed him a couple of days later to discard two handguns, a silver automatic and a black and brown revolver. He threw the guns into a trash can.
Barbara Rogers resides at the apartment on 19th Street where Borrero and Robinson had met with Mike earlier on January 31, 1994, to discuss the robbery plan. Rogers testified that, towards the end of 1993, she allowed Mike and Petitioner to move into her apartment; Petitioner left after a short stay and, in January 1994, Rogers asked Mike to leave. Mike came to her apartment on January 31, 1994, to pick up his belongings. Petitioner arrived sometime after 2:00 p.m. and, thereafter, he and Mike “were in and out” of the apartment. Rogers overheard Mike say that there was a “sweet spot” that had $80,000, to which Petitioner responded, “[ljet’s take the moth *501 erfucking joint.” Mike said that he “would never have to hustle again” and would take his share and return to Jamaica. Petitioner said that he was going to buy a nice car. Borrero called Rogers’s apartment that same afternoon to speak to Mike. About thirty to forty-five minutes later, Borrero and Robinson arrived at her apartment. Rogers believed that all four left sometime before 3:00 p.m.
Rogers further testified that, a couple of days later, Petitioner and Mike were in her apartment and she again heard them talking about the robbery. Rogers testified that she overheard Petitioner say that “his fingerprints ain’t on nothing and didn’t nobody see him nowhere near the place.” She also heard Petitioner say that “a man dead and we didn’t get a damn dime.” Rogers also testified that in early 1994 she helped the Montgomery County Police Department identify persons involved in the crime and received $820 and additional money to pay her telephone bill. She also admitted that she was negotiating a bad checks case with the U.S. Attorney, stating, though, that her case had nothing to do with her testimony and she did not receive any financial assistance or leniency in that federal case for her testimony as a witness against Petitioner.
Atkins, the American Mailbox storekeeper, survived the shooting and testified about the incident. On that day, two kids came into the store. After one kid made a purchase, Atkins handed him his change and the receipt; the kid then pulled out a dark grey gun and shot Atkins in the mouth. The kid shooter then looked for money while the other kid stood there. When Covington, the storekeeper from down the street, entered the store, the kid who shot Atkins also shot Covington. That same kid then stood over Atkins and shot him again; Atkins had his hands over his head and the bullet went through his arm. Atkins had identified Borrero before trial as the shooter and confirmed that identification at trial. Atkins also identified the receipt for the attempted robbers’ purchase that had been left behind. The receipt was dated January 31,1994, with a time of 4:39 p.m. *502 Three Montgomery County Police Department officers testified about the crime scene, the arrest of Petitioner, and the Celebrity — the car that had been abandoned a few blocks from the American Mailbox. In addition, Charles Felker, a latent fingerprint examiner for Montgomery County Police Department admitted as an expert in fingerprint identification, testified that he found Borrero’s prints on the driver’s side of the Celebrity and Petitioner’s and Mike’s fingerprints on the New Yorker.
As further support of its theory that Petitioner participated in the crime, the State called Joseph Kopera, a ballistics expert, to testify that a bullet and shell casings found at the American Mailbox crime scene matched bullets and shell casings from an unrelated shooting incident on January 23, 1994, involving Petitioner. Kopera testified that he worked for the Maryland State Police Ballistics Laboratory, a position he held for the past three years and, for twenty-two years before that, he worked at the Baltimore City Crime Lab in the Ballistics Unit. He added that he worked long hours, testified about 125 to 130 times a year, and conducted around 1,200 to 1,400 examinations a year. He explained that the ballistics field entails identification of firearms, projectiles, and cartridge cases. He stated that he had testified in jurisdictions across Maryland, in other state courts in the mid-Atlantic region, and in the federal courts.
Pertinent here, Kopera testified about his credentials as follows:
There are no colleges or universities that offer a degree in the field specifically of ballistics or firearms identification, so all knowledge of the field is done by way of on-the-job training. I spent a tenure of five years on-the-job training with the FBI and also with the Baltimore City Firearms Laboratory before becoming court-qualified. Before this training, we must fit the qualifications as far as educational background to get into the field. The State Police and also the Baltimore City Crime Lab and the FBI require a science-related degree in a field relative — in an area relative to your field. I hope [sic] a degree in engineering from the *503 University of Maryland here in the State of Maryland and also an engineering degree from the Rochester Institute of Technology in the state of New York. I am a graduate of the FBI Academy in the fields of ballistics. I am on the board of directors for the Association of Firearm and Tool Mark Examiners, which is the governing agency of firearms experts here in the United States and many countries abroad.
The trial court admitted Kopera as an expert in ballistics identification.
Kopera testified that he examined two 9-millimeter bullets and three casings recovered from the unrelated January 23rd shooting and one 9-millimeter bullet and three casings from the American Mailbox crime scene. Kopera concluded that the bullets and casings from both scenes were fired from the same gun. He further opined to a reasonable degree of scientific probability that the firearm used in both shootings was a semiautomatic pistol.
In support of Petitioner’s involvement in the January 23rd incident, the State presented three witnesses to the shooting on that day. All three testified that they saw Petitioner shoot a gun while hanging out with Mike.
Petitioner testified that he was not involved in the planning or commission of the failed armed robbery. According to Petitioner, a couple of days before the crime, he traded the New Yorker for Skinny’s Celebrity. Then, on January 31, 1994, he was driving the Celebrity “up Georgia Avenue.” He testified: “I stopped [the] car to go into a store to buy something to eat .... I left the ignition running to go and purchase something. By the time I returned to the car, the car was not there.” Petitioner added that the car was stolen sometime between 3:00 p.m. and 4:00 p.m., or as early as 2:30 p.m. Petitioner then called Mike so that Mike could contact Skinny to inform him that the car had been stolen. Petitioner found the New Yorker parked nearby and, having a set of keys to that car on his person that day, began driving that vehicle. In response to the court’s questioning how he knew *504 the New Yorker was only a few blocks away from where the Celebrity was stolen, Petitioner said, “I guess I had drove by and seen it there. I’m not quite sure, but I know it was there.” Petitioner testified that, once in possession of the New Yorker, he picked up Mike. The two went to Skinny’s girlfriend’s house to let her know that the Celebrity had been stolen. Petitioner and Mike then drove to Mike’s daughter’s house in Maryland; he was there “around 4:30 to 5:00,” and then “was just basically driving around basically for the rest of the evening.”
Petitioner was questioned on cross-examination about a signed statement he had made to police that was not completely consistent with his testimony on direct examination. In that statement, Petitioner had told the police that, between 3:00 p.m. and 4:00 p.m. on the day of the crime, he was with Mike at a McDonald’s on Georgia Avenue and that he gave the Celebrity to a girl who was with Skinny. When questioned at trial yvhy he did not tell the police that the Celebrity had been stolen, Petitioner testified that he had not wanted to tell the police that he had been driving that car while his license was suspended.
During closing arguments, the State emphasized that the case rested upon accomplice liability and that, because Petitioner was a co-conspirator to the planned armed robbery, he was guilty of the crimes committed in furtherance of the conspiracy. The State pointed out that Petitioner could not keep his story straight while testifying; moreover, his own words “place[d] him with Mike at the time of the murder.” The State recapped the testimony that linked Petitioner to Mike and the murder weapon and, in that regard, referred to the ballistics testimony of Kopera. The State emphasized that the timing of events in the case was crucial and that the testimony of Vanessa Hood, her son, Vandell Roseman, and Barbara Rogers each, standing alone, corroborated aspects of Borrero’s testimony.
The jury found Petitioner guilty on all counts. The judgment was affirmed by the Court of Special Appeals in an unreported opinion.

*505
The Petition for Writ of Actual Innocence

On May 16, 2013, Petitioner filed a petition for writ of actual innocence. Petitioner alleged that, at his trial, Kopera lied to the jury by testifying that he earned engineering degrees from Rochester Institute of Technology and the University of Maryland and graduated from the FBI Academy in the field of ballistics. Petitioner stated that, on December 15, 2011, he received a cover letter from an Assistant State’s Attorney enclosing a letter to her, dated March 8, 2007, from Colonel Thomas E. Hutchins, Secretary of the Maryland State Police. Colonel Hutchins’s letter addressed the discovery of discrepancies concerning Kopera’s education. Petitioner attached those two letters to his petition along with two newspaper articles reporting that state police investigators had confirmed that Kopera did not earn degrees from Rochester Institute of Technology or the University of Maryland and that Kopera provided a forged college transcript from the University of Maryland to an attorney who confronted him about the discrepancies. Petitioner also attached an affidavit of William E. Conrad, Forensic Firearms Consultant, which had been filed in a separate, unrelated case in which Kopera had testified. Conrad expressed concern with Kopera’s alleged qualifications because Kopera had stated that he graduated from the “F.B.I. Academy in the field of firearms identification and gunpowder residues”; yet, no such educational course had been offered.
Petitioner argued that Kopera’s false testimony about his academic credentials rendered his remaining testimony unreliable. Moreover, “without the contested ballistics results and perjured testimony” from Kopera, there is a “substantial or significant possibility that the result may have been different.” The State opposed the petition but conceded that Kopera had lied about his credentials. The State argued, among other things, that the claim was waived because a competent defense attorney would have discovered Kopera’s falsehoods in time to file a motion for new trial and, even so, there was “no significant possibility that the outcome of the proceedings in McGhie’s case would have been different had counsel discovered the falsification of credentials by Mr. Kopera.”
*506 The Honorable Robert Greenberg (“the hearing judge”) presided over the hearing on the petition and denied it in a written opinion and order. The hearing judge rejected the State’s assertion that Petitioner had waived his claim. The judge explained that Kopera’s false testimony could not have been discovered by defense counsel’s exercise of due diligence:
There is no evidence that was presented to this court to demonstrate that Kopera was exaggerating his qualifications prior to Petitioner’s trial in 1994. Apparently, no red flags had been raised from Kopera’s testimony in other cases that would require a competent defense attorney to question Kopera’s pedigree, collegiate record, or the like.
... To hold defense counsel to the requirement of a background check of an expert who had testified in scores of cases is unrealistic. Indeed, the State — which should bear some responsibility for its own expert’s mendacity — was likewise in the dark about the situation. Why should a greater burden devolve upon the defense?
Turning to whether Petitioner had proved his entitlement to a new trial based on the newly discovered evidence, the hearing judge noted the absence of a provision in § 8-301 or case law explaining the analysis a court should employ when considering the impact of such evidence. The hearing judge pondered whether a court should “simply excise the false testimony and then, based on the remaining evidence, determine whether the result would have been different” or “consider whether the result would have been different if it was revealed during the trial that Kopera’s educational qualifications were exaggerated.”
The hearing judge concluded that the first of the two standards — excision of the false testimony — is the correct standard and, applying that standard, determined that there was no possibility that the verdict would have been different without Kopera’s testimony about his education.[4] The hearing *507 judge concluded that the “jury would not have been influenced in any way — much less substantially or significantly — by the lack of testimony concerning Kopera’s college education.” The judge further reasoned that Kopera’s testimony, to which the State during closing argument relied “only in passing” and the defense counsel not at all, “while helpful to the State, was not central to the case.”
The hearing judge also considered Petitioner’s claim under the alternative analysis — had the jury known of Kopera’s perjured testimony — and concluded that the verdict would not have been affected even under that alternative because “[tjhere was ample testimony directly implicating Petitioner in the murder, aside from ballistics evidence.” The hearing judge highlighted the testimony of Borrero, Hood, Roseman, and Rogers. The judge noted, in that analysis, that Petitioner testified in his defense but never refuted Rogers’s testimony, thereby leaving her testimony about his incriminating statements “uncontradicted.”
The Court of Special Appeals affirmed, for all the same reasons, the hearing judge’s denial of Petitioner’s petition for writ of actual innocence. McGhie, 224 Md.App. at 288, 120 A.3d 828.
We granted Petitioner’s petition for writ of certiorari to answer two questions, which we have reworded:
*508 1. When ruling on a petition for writ of actual innocence, how should a circuit court apply newly discovered evidence that an expert witness lied about his academic credentials to determine if that evidence creates a substantial or significant possibility that the result may have been different?
2. Did the hearing judge err or abuse his discretion in denying Petitioner’s petition for writ of actual innocence?
II.
The two questions before us, reduced to their essence, ask if the hearing judge committed legal error or abused his discretion in deciding that Petitioner was not entitled to relief under § 8-301. To answer both questions we look first to the language of § 8-301, in particular, subsections (a) and (g):
(a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
(1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.[5]
*509 (g) A petitioner in a proceeding under this section has the burden of proof.
See also Md. Rule 4-332.[6]
We bear in mind that “ ‘decisions on the merits of requests for new trials based on newly discovered evidence, whether filed pursuant to Rule 4-331 or [§ 8-301], are committed to the hearing court’s sound discretion.’ ” State v. Hunt, 443 Md. 238, 257, 116 A.3d 477 (2015) (quoting Douglas *510 v. State, 423 Md. 156, 188, 31 A.3d 250 (2011)). We, however, do not leave to the hearing judge’s discretion the resolution of purely legal questions. Id. at 247, 116 A.3d 477.
Petitioner argues that the hearing judge erred or abused his discretion in ruling ultimately that Petitioner had not carried his burden to establish his entitlement to relief of a new trial on the ground that the newly discovered evidence of Kopera’s false testimony about his academic credentials created a substantial or significant possibility that the result may have been different. The State does not contest the hearing judge’s threshold determination that the evidence of Kopera’s lies about his academic credentials was “newly discovered.” The State, not surprisingly, further agrees with the hearing judge’s ultimate determination that Petitioner did not prove his entitlement to the relief of a new trial on the basis of Kopera’s false testimony about his academic qualifications. The parties do not dispute that the substantial or significant possibility standard “falls between ‘probable,’ which is less demanding than ‘beyond a reasonable doubt,’ and ‘might’ which is less stringent than probable.” Yorke v. State, 315 Md. 578, 588, 556 A.2d 230 (1989); see also Yonga v. State, 446 Md. 183, 210-11, 130 A.3d 486 (2016) (describing the Rule 4-331 standard as the “bedrock” and “foundation” of § 8-301).
Although the parties agree on the proper standard, they would have us employ different analyses in its application. The State proposes that we adopt a novel approach to determining whether a petitioner seeking relief under § 8-301 is entitled to a new trial based on newly discovered evidence that a State’s expert witness testified falsely about his credentials. The State urges adoption of a “prospective” analysis, under which the hearing judge and any reviewing court hypothesize whether a new trial without the expert witness’s perjured testimony would result in a verdict different from that reached at the actual trial. The State argues that a retrospective approach— one that looks back to the petitioner’s trial to determine the impact the new evidence would have had on the result — is illogical because it assumes that the “prosecutor would knowingly present false testimony from its experts.” Petitioner *511 takes exception to the State’s proposal and argues that the plain language of § 8 — 301(a)(1) requires a retrospective approach that considers the impact of the newly discovered evidence at the trial that occurred.
We agree with Petitioner. By its past tense choice of the text, the General Assembly made plain that § 8-301(a)(l) requires courts to look back to the trial that occurred to determine whether the newly discovered evidence “creates a substantial or significant possibility that the result may have been different.]” (Emphasis added). See also Hunt, 443 Md. at 264, 116 A.3d 477 (explaining that “the Circuit Court must determine whether the new evidence regarding Kopera creates a substantial or significant possibility that the result of their trials may have been different” (emphasis added)). In this case, the hearing judge properly “looked back” to what occurred at Petitioner’s trial to decide whether he had proved his entitlement to relief.
The parties’ disagreement does not end there, as each takes issue with the other’s view of how to apply the “looking back” approach. The State asserts that when, as here, the newly discovered evidence is that a State’s expert witness testified falsely at the trial, the hearing judge need only excise the false testimony and then determine from the remaining evidence whether there is a substantial or significant possibility that the result at trial may have been different. Petitioner counters that the hearing judge must decide whether, had the jurors been aware of the falsehood, there is a substantial or significant possibility that the result of the trial may have been different.
Again we agree with Petitioner. The appropriate analysis is not simply to excise the falsehood, for such an approach, as applied to this case, ignores the “substantial or significant possibility” that one or more of the jurors at Petitioner’s trial, had they known of Kopera’s false testimony about his credentials, would have discredited his testimony in its entirety.[7] See *512 State v. Plude, 310 Wis.2d 28, 750 N.W.2d 42, 56 (2008) (concluding that where an expert witness lied about his credentials, the reliability of the expert’s substantive testimony may have been affected). We spoke of this possibility in Hunt, 443 Md. at 263-64, 116 A.3d 477.
In Hunt, we declared as “overly rigid” the distinction the Court of Special Appeals identified in Jackson v. State, 216 Md.App. 347, 367, 86 A.3d 97, cert. denied, 438 Md. 740, 93 A.3d 289 (2014), between “impeaching” evidence, i.e., evidence that a witness lied about the merits of the case, and so-called “merely impeaching” evidence, i.e., false testimony concerning the witness’s credibility. 443 Md. at 263-64, 116 A.3d 477. Pertinent here, we observed in Hunt that, “[w]hen an expert is called to testify, it is conceivable that, based on the cumulative body of evidence presented at a given trial, falsity regarding the expert’s credibility and qualifications might ‘create! ] a substantial or significant possibility that the result may have been different.’ ” Id. at 264, 116 A.3d 477 (alteration in original) (quoting § 8-301(a)(l)). We adopt here the Hunt dicta and apply it to the case before us. If the jury is made aware that the expert lied about his qualifications, the jury might also reasonably find that other aspects of the expert’s testimony are not reliable.[8]
The hearing judge correctly addressed the petition, albeit as an alternative, by considering whether there was a substantial or significant possibility that, had the jury known of Kopera’s lies about his academic credentials, the jury would have discounted his testimony in its entirety. With that ballistics testimony out of the equation, the judge considered the *513 other evidence that was presented to the jury and concluded that he “cannot find that the verdict would have been different”:
There was ample testimony directly impheating Petitioner in the murder, aside from ballistics evidence. Vanessa Hood testified that Petitioner and his three co-conspirators came to her home the afternoon after the murder, leaving two handguns on her bed. Petitioner and another had visited earlier in the day to pick up one of the weapons.
During this time, a news bulletin was broadcast on the television which described the murder. Ms. Hood’s son, Vandell Roseman, testified that Petitioner had him drive past the scene of the shootings that same afternoon, presumably to see what investigation was taking place, and perhaps to see what had become of the abandoned automobile that transported the conspirators to the murder scene. Roseman later disposed of the two guns, at his mother’s "request. Petitioner told Roseman, after cruising by the murder scene, to “forget it and just go back home.”
Edward Borrero, who shot the murder victim, testified to Petitioner’s presence during the planning stage of the crime and during the getaway. ...
Barbara Rogers heard Petitioner discussing the crime before its consummation, telling a confederate, “Let’s take the motherfucking joint.” He said he was going to get a nice car with his share of the money, thought to be $80,000.00, that would be the fruit of the intended robbery. After the crime, she heard him lament that a man was dead, and that Petitioner “didn’t get a damn dime.” He also was apparently heartened by the fact that his fingerprints were nowhere to be found at the crime scene.
Of special significance, Petitioner took the witness stand and testified at trial. While Ms. Rogers’ motives for testifying were vigorously challenged by the defense on cross-examination and in closing argument, never did Petitioner even attempt to rebut or refute Ms. Rogers’ testimony regarding his incriminating statements, and her testimony stands uncontradicted.
*514 It is important to note that the hearing judge made no mention of the three witnesses who testified that Petitioner shot a gun in an unrelated incident on January 23, 1994. We assume that the hearing judge understood that the testimony of those lay witnesses had to be discounted, along with Kop-era’s ballistics testimony, as the jury would not have heard the testimony of the lay witnesses save for Kopera’s testimony linking that gun to the crime at issue. The hearing judge correctly eliminated that lay witness testimony from his analysis.
We discern no legal error or abuse of discretion on the part of the hearing judge in properly analyzing the petition by recognizing the reasonable possibility that the jury, aware of Kopera’s lies about his academic credentials, would have discounted his testimony on the merits, as well as the lay witness testimony that followed from it. Neither did the hearing judge abuse his discretion in ruling, in the end, that, given the weight of the evidence presented against him at trial, Petitioner was unable to prove that Kopera’s lies “create[d] a substantial or significant possibility that the result may have been different.” We therefore affirm the judgment of the Court of Special Appeals.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.
McDonald, J., concurs.
Raker, J., dissents.

. All further statutory references are to the Criminal Procedure Article.

. Under the terms of that agreement, Borrero pleaded guilty to six charges, including first-degree murder, in exchange for the State’s recommendation of a life sentence with, rather than without, the possibility of parole.

. Mike’s full name is Frederick DeSuzar. We refer to him as "Mike,” as that is how he is referred to throughout the record.

. The hearing judge derived that analysis from Kulbicki v. State, 207 Md.App. 412, 447, 53 A.3d 361 (2012), rev’d on other grounds, 440 Md. 33, 99 A.3d 730 (2014), rev’d, - U.S. -, 136 S.Ct. 2, - L.Ed.2d *507 -, aff’d, 445 Md. 451, 128 A.3d 29 (2015). Kulbicki was a postconviction case in which Kulbicki had argued, among other claims, that Kopera's false testimony about his credentials at Kulbicki’s trial violated his due process entitlement to a fair trial. 207 Md.App. at 443, 53 A.3d 361. The Court of Special Appeals agreed with and affirmed the postconviction judge’s decision to excise only the false testimony. The court also agreed with the judge’s ultimate ruling that "there simply is no likelihood that the jury’s determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed" because “the record reflected that ballistics is a field for which no college degree is offered, and the expertise for the field is usually based on experience, which Kopera had in copious amounts.” Id. at 447, 53 A.3d 361. This aspect of the Court of Special Appeals's opinion in Kulbicki was not the subject of the subsequent opinions of this Court or the United States Supreme Court.

. Rule 4-331 provides in relevant part:
(a) Within ten days of verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.
(c) Newly discovered evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
(1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct *509 appeal from the judgment or a belated appeal permitted as post conviction relief[.]

. We promulgated Maryland Rule 4-332 to elaborate on the procedures for filing a petition for writ of actual innocence. Subsection (d)(9) provides, among other pleading requirements, "that the conviction sought to be vacated is based on an offense that the petitioner did not commit[.]” At oral argument before this Court, counsel for both parties were questioned about whether the petition failed to comply with Rule 4 — 332(d)(9) because the petition does not contain an express averment "that the conviction sought to be vacated is based on an offense that the petitioner did not commit."
We recognized in State v. Hunt, 443 Md. 238, 255-56, 116 A.3d 477 (2015), that the petition of one of the two petitioners in that case, Hardy, did not comply with some of the technical requirements of Rule 4-332(d). Nevertheless, we concluded that Hardy’s petition satisfied the pleading requirements, id. at 264, 116 A.3d 477, because the circuit court had not dismissed his petition for failing to comply substantially with the pleading requirements, id. at 255-56, 116 A.3d 477. We pointed out that Rule 4 — 332(i)(l) provides a "relief valve” from dismissal of the petition, in which dismissal is not required if it is determined that the petition substantially complies with the requirements of subsection (d). Id.
Rule 4 — 332(i)(l) provides that,
[u]pon consideration of the petition and the State’s response, the court may (A) dismiss the petition if it finds as a matter of law that the petition fails to comply substantially with the requirements of section (d) of this Rule or otherwise fails to assert grounds on which relief may be granted or (B) grant leave to amend the petition to correct the deficiency!)]
The record makes plain that Petitioner had testified at trial to his actual innocence of the charged crimes. The State has not moved to dismiss the petition for lack of an averment of innocence and, in response to this Court’s questions at oral argument, had no quarrel with the adequacy of the petition. Moreover, the hearing judge evidently did not recognize any problem in this regard and proceeded to conduct a hearing on the merits of the petition. Under these circumstances, and detecting no jurisdictional concern with the lack of an averment of innocence, we have no just reason to direct a dismissal of the petition.

. The State does not appear to contest the "materiality” of Kopera’s false testimony about his academic credentials, and the hearing judge *512 made no finding that Kopera’s false testimony was immaterial. We therefore proceed to the ultimate question for decision: whether the hearing judge erred or abused his discretion in ruling that Petitioner had not proved his entitlement to a new trial.

. We do not agree with Petitioner that there is a substantial or significant possibility that, if armed with the knowledge that one of the State’s witnesses, Kopera, lied, the jurors reasonably would have distrusted the credibility of the other witnesses the State presented to trial.